**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| KANSANS FOR CONSTITUTIONAL FREEDOM,<br><br>        Plaintiff,<br><br>   v.<br><br>KRIS KOBACH in his official capacity as Attorney General of Kansas, NICHOLAS HALE in his official capacity as Chairman of the Kansas Governmental Ethics Commission,[1] SAMUEL KLAASSEN in his official capacity as a Member of the Kansas Governmental Ethics Commission, JEROME HELLMER in his official capacity as a Member of the Kansas Governmental Ethics Commission, BEAU JACKSON in his official capacity as a Member of the Kansas Governmental Ethics Commission, CHRIS BURGER in his official capacity as a Member of the Kansas Governmental Ethics Commission, JERRY WALLENTINE in his official capacity as a Member of the Kansas Governmental Ethics Commission, EARL GLYNN in his official capacity as a Member of the Kansas Governmental Ethics Commission, TESS RAMIREZ in her official capacity as a Member of the Kansas Governmental Ethics Commission, JOHN/JANE DOE in his or her official capacity as a Member of the Kansas Governmental Ethics Commission, and WADE WIEBE, in his official capacity as Executive Director of the Kansas Governmental Ethics Commission,<br><br>        Defendants. | Case No. |

---

[1] After July 1, 2025, the Kansas Governmental Ethics Commission will be redesignated as the Kansas Public Disclosure Commission. H.B. 2206, 2025-2026 Leg. Sess. (Kan. 2025). When the same bill goes into effect on July 1, 2025, it will re-number several of the statutory provisions cited in this complaint.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Kansans for Constitutional Freedom files this complaint against Defendants KRIS KOBACH in his official capacity as Attorney General of Kansas, NICHOLAS HALE in his official capacity as Chairman of the Kansas Governmental Ethics Commission, SAMUEL KLAASSEN in his official capacity as a Member of the Kansas Governmental Ethics Commission, JEROME HELLMER in his official capacity as a Member of the Kansas Governmental Ethics Commission, BEAU JACKSON in his official capacity as a Member of the Kansas Governmental Ethics Commission, CHRIS BURGER in his official capacity as a Member of the Kansas Governmental Ethics Commission, JERRY WALLENTINE in his official capacity as a Member of the Kansas Governmental Ethics Commission, EARL GLYNN in his official capacity as a Member of the Kansas Governmental Ethics Commission, TESS RAMIREZ in her official capacity as a Member of the Kansas Governmental Ethics Commission, JOHN/JANE DOE, a currently unknown person, in his or her official capacity after being appointed to fill a current vacancy on the Kansas Governmental Ethics Commission, and WADE WIEBE, in his official capacity as Executive Director of the Kansas Governmental Ethics Commission, and alleges as follows:

## NATURE OF THE CASE

1.     The First Amendment protects against laws that abridge the freedom of speech or association. Central to its protections is the foundational principle that allowing for free and robust debate about salient issues of the day is among our most cherished constitutional values. With the enactment of House Bill 2106 ("HB 2106"),[2] Kansas has adopted a series of impermissibly

---

[2] The text of HB 2106 is attached as Exhibit A.

2

restrictive, overbroad, and vague restrictions on issue-advocacy speech that will unconstitutionally impede public debate in Kansas about some of the most important policy issues of our times.

2.     The Supreme Court has long held that spending to promote political advocacy is core First Amendment speech, entitled to the Constitution's most vigorous protections. This includes spending to influence or affect the vote on any question submitted directly to the voters, activity that the Court held nearly 50 years ago is "at the heart of the First Amendment's protection." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978); *see also id*. at 767–68. Moreover, when a law imposes criminal penalties or threatens core protected speech, it is subject to heightened scrutiny under the Constitution's due process protections, lest it fail to inform the public of what it prohibits or lend itself to arbitrary or discriminatory enforcement. With the enactment of HB 2106—which, unless enjoined, will go into effect on July 1, 2025—Kansas violates these critical constitutional protections in several different ways.

3.     The bill's proponents claimed that HB 2106 is necessary to protect against foreign interests influencing its voters as they decide whether to approve or reject proposed constitutional amendments. But HB 2106's new broad, expansive, and burdensome restrictions are not limited to foreign governments or their subsidiaries, foreign nationals situated abroad with little to no connection to the United States, or foreign corporations. The law's definition of foreign national reaches many who are lawfully residing in the United States (pursuant to student or work visas, for example). These individuals are entitled to First Amendment protection for their issue advocacy, but even if they were not, U.S. citizens have the right to hear their perspective on these important questions of policy.

4.     That said, in this case, the Court need not even reach the question of whether Kansas could prohibit certain foreign nationals from engaging in spending to promote or oppose a

proposed constitutional amendment because HB 2106's restrictions are targeted not at the "foreign interests" Kansas claims it means to silence, but at those who associate with them. Through a series of exceedingly broad, highly invasive, and at times completely incomprehensible restrictions, HB 2106 will muzzle the speech of U.S. citizens and domestic organizations far more effectively than that of the foreign nationals Kansas claims it means to target.

5.     This includes the speech of Plaintiff Kansans for Constitutional Freedom, a Kansas-based domestic organization that has previously advocated against an amendment to the Kansas Constitution and, but for HB 2106, would continue to use its existing resources and future donations to support or oppose proposed amendments. But under the plain terms of HB 2106, it will be *entirely* barred from participating in *any* advocacy for or against constitutional amendments in Kansas, unless an injunction is issued. HB 2106 threatens Kansans for Constitutional Freedom's constitutional rights in several different ways. It brings this action as a result.

6.     First, HB 2106 makes it a crime for anyone to accept, "directly or indirectly, any contribution or expenditure from a foreign national made for any activity promoting or opposing the adoption or repeal of any provision of the" Kansas Constitution. K.S.A. § 25-4180(d)(1).[3] With the sole exception of legal permanent residents, accepting a contribution or expenditure directly or indirectly from *any* noncitizen for the purpose of any activity advocating for or against an amendment to the Kansas Constitution will now be a crime. And both because this section of HB 2106 has no *mens rea* requirement and because it expressly empowers "[a]ny person who believes" a violation to have occurred to file a complaint directly with the Attorney General, the breadth of

---

[3] All citations to K.S.A. § 25-4180 refer to the text of that section of the Kansas Statutes as amended by HB 2106.

the chill on protected speech will be significant, making even U.S. citizens reluctant to associate with or collaborate on ballot issue advocacy with anyone who might be believed to be a noncitizen.

7.    Second, HB 2106 prohibits U.S. citizens and domestic organizations like Kansans for Constitutional Freedom from engaging in any activity promoting or opposing an amendment to the Kansas Constitution *unless* they can certify that (1) they have not knowingly accepted contributions or expenditures directly or indirectly from a foreign national at any time or for any purpose, K.S.A. § 25-4180(a)(1), and (2) none of the donors that contributed to them for the purpose of engaging in constitutional issue advocacy has knowingly accepted, directly or indirectly, any contributions or expenditures from foreign nationals above a certain threshold for any purpose within a four-year period, K.S.A. § 25-4180(a)(2). In other words, K.S.A. § 25-4180 effectively prohibits *anyone* who accepts money or property for the purpose of engaging in constitutional ballot issue advocacy from engaging in such advocacy *if* they have knowingly accepted contributions or expenditures directly or indirectly from a foreign national of *any* amount and at *any* point in time. And it further imposes burdensome and invasive obligations on anyone who accepts donations to engage in this type of issue advocacy to demand from their donors information far attenuated from the actual issue advocacy itself.

8.    Third, through yet another similarly attenuated, overbroad, and highly restrictive provision, HB 2106 prohibits anyone from making *independent expenditures* to support or oppose a Kansas constitutional ballot measure if they have accepted "any moneys" from any foreign national, directly or indirectly, above a certain threshold, for any purpose, in the four years prior, or will accept any amount looking forward to include the remainder of the calendar year. K.S.A. § 25-4180(c).

9.     Each of HB 2106's challenged restrictions constitute unconstitutional attacks on core First Amendment rights, and their effects, both individually and together, will be to broadly dampen public discussion on Kansas constitutional ballot measures—questions of pure issue advocacy. Under decades of well-established Supreme Court precedent, they are subject to strict scrutiny. *See, e.g.*, *Bellotti*, 435 U.S. at 795; *Citizens Against Rent Control/Coal. For Fair Hous. v. City of Berkeley*, 454 U.S. 290, 296 (1981). They cannot survive.

10.     While federal prohibitions on contributions and spending by "foreign nationals" in relation to *candidate*-related elections may pass constitutional scrutiny, that is because of compelling interests that are unique to the candidate context. In contrast, the Supreme Court has found that these same concerns are simply not present in the ballot issue advocacy context; accordingly, they cannot similarly justify infringements on those core protected rights. Specifically, the Court has held that the government may impose certain limited restrictions on candidate-related contributions and spending specifically to guard against potential influence of candidates by donors, who once in office may make policy choices in accordance with the views of those donors—and not in the interests of the voters who elected them. *See, e.g.*, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 305 (2022) ("This Court has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."); *see also Buckley v. Valeo*, 424 U.S. 1, 26–27 (1976).

11.     As the Supreme Court recognized in *Bellotti* nearly fifty years ago, "[t]he risk of corruption perceived in cases involving candidate elections *simply is not present* in a popular vote on a public issue." 435 U.S. at 790 (internal citations omitted) (emphasis added); *see also Sampson v. Buescher*, 625 F.3d 1247, 1255 (10th Cir. 2010) ("The legitimate reasons for regulating candidate campaigns apply only partially (or perhaps not at all) to ballot-issue campaigns."). The

reason why is simple: such elections "are held on issues, not candidates for public office." *Bellotti*, 435 U.S. at 790. Thus, if a majority of voters vote in favor of a constitutional amendment at the ballot box, the amendment becomes law; no amount of spending—regardless of its source—can change that amendment, which is set forth in the text the voters themselves approved.

12.    Nor is there any legitimate basis for dampening discussion surrounding the issue as the voters consider it. To the contrary, the Supreme Court has recognized, "the direct participation of the people in a[n] [issue-related election], if anything, increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *Bellotti*, 435 U.S. at 790 n.29 (cleaned up). Yet HB 2106's broad and sweeping prohibitions take direct aim at this full and free discussion. The Supreme Court has been clear that the concern that certain speech "may persuade the electorate is hardly a reason to suppress it." *Id*. at 790. "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments," and the First Amendment squarely "rejects the 'highly paternalistic' approach of statutes like [HB 2106] which restrict what the people may hear." *Id.* at 791 & n.31.

13.    Further, HB 2106's failure to include a heightened *mens rea* requirement for its new criminal provision contravenes clear Supreme Court precedent holding that civil or criminal liability may be imposed only if the government can prove an appropriately culpable, subjective mental state. As a result, that section of the statute independently violates the First Amendment.

14.    HB 2106 is also unconstitutionally vague, in violation of the Fourteenth Amendment's Due Process Clause. Liability under HB 2106 is conditioned on phrases that are hopelessly unclear (sometimes to the point of being nonsensical), providing no meaningful guidance to entities who wish to speak for or against constitutional amendments and inviting

arbitrary enforcement, with the natural effect of chilling protected speech at the core of the First Amendment's protections.

15.    Finally, HB 2106 offends constitutional due process because it retroactively, and unjustifiably, prevents Kansans for Constitutional Freedom from engaging in advocacy in support of or in opposition to any constitutional amendment based on conduct that was entirely lawful when it occurred.

16.    To remedy these clear constitutional violations and to ensure its continued ability to engage in political issue advocacy, Kansans for Constitutional Freedom seeks a declaratory judgment that HB 2106 violates the First and Fourteenth Amendments, and preliminary and permanent injunctive relief enjoining its implementation and enforcement.

## JURISDICTION AND VENUE

17.    Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

18.    This Court has original jurisdiction over this action because the matters in controversy arise under the U.S. Constitution. 28 U.S.C. § 1331. The Court also has original jurisdiction because this action seeks redress from the deprivation, under color of state law, of a right secured by a provision of the U.S. Constitution providing for equal rights of U.S. citizens. *Id.* § 1343.

19.    This Court has personal jurisdiction over Defendants, who are sued in their official capacities.

20.    Venue is proper in the U.S. District Court for the District of Kansas because (1) Defendants reside in this judicial district, and (2) a substantial part of the events that give rise to Plaintiff's claim occurred, and will occur, in this judicial district. 28 U.S.C. § 1391(b).

21.     This Court has the authority to enter a declaratory judgment and provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

## PARTIES

22.     Plaintiff Kansans for Constitutional Freedom ("KCF") is a non-profit corporation incorporated and operating in Kansas and organized and operating under Section 501(c)(4) of the Internal Revenue Code. It was formed in 2021 by a bipartisan coalition of reproductive rights advocates and allied organizations committed to protecting the constitutional rights of Kansans and keeping abortion safe and legal, as the primary organization in opposition to a proposed amendment to the Kansas Constitution that would have eliminated the constitutional right to abortion in the state (the "2022 Amendment").

23.     KCF is supported by a wide array of individual and organizational donors, including from nearly every corner of Kansas. It spent more than $11 million opposing the 2022 Amendment in the lead-up to the August 2, 2022 election. That money was spent producing and placing television advertisements opposing the amendment, communicating with voters through direct mail, and funding a robust field program to communicate directly with Kansas voters and help turn out the vote. Since it successfully defeated the 2022 Amendment, KCF has continued to advocate for reproductive freedom in Kansas.

24.     In future election cycles, KCF plans to use its existing resources and future contributions to support or oppose other constitutional amendments. Most immediately, KCF would like to spend to oppose a recently proposed amendment to the Kansas Constitution that threatens to dramatically curtail the independence of the state's judicial branch. KCF has already secured funding commitments for this purpose from some of the same organizational donors that

supported its efforts against the 2022 Amendment. But as a direct result of HB 2106's unconstitutional restrictions, KCF will no longer be able to engage in any of its planned advocacy.

25.     Defendant Kris Kobach is the Attorney General of Kansas. He is sued in his official capacity. As Attorney General, he "may prosecute any person who violates" the criminal provisions added by HB 2106. K.S.A. § 25-4180(d)(2).

26.     Defendant Nicholas Hale is the Chairman of the Kansas Governmental Ethics Commission (the "Commission"). He is sued in his official capacity. The Commission is empowered to bring a civil action for injunctive relief and statutory damages to enforce HB 2106's prohibition on accepting funds from foreign nationals for activities promoting or opposing a constitutional amendment. K.S.A. § 25-4180(d)(3).

27.     Defendant Samuel Klaassen is a Member of the Commission. He is sued in his official capacity.

28.     Defendant Jerome Hellmer is a Member of the Commission. He is sued in his official capacity.

29.     Defendant Beau Jackson is a Member of the Commission. He is sued in his official capacity.

30.     Defendant Chris Burger is a Member of the Commission. He is sued in his official capacity.

31.     Defendant Jerry Wallentine is a Member of the Commission. He is sued in his official capacity.

32.     Defendant Earl Glynn is a Member of the Commission. He is sued in his official capacity.

33.    Defendant Tess Ramirez is a Member of the Commission. She is sued in her official capacity.

34.    Defendant John/Jane Doe, whose true name is currently unknown, will later be appointed to fill a current vacancy on the Commission. John/Jane Doe is sued in his or her official capacity.

35.    Defendant Wade Wiebe is the Executive Director of the Commission. He is sued in his official capacity.

## LEGAL BACKGROUND

36.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

37.    The Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014) (cleaned up).

38.    As a result, central to the First Amendment's core protections are the "right to participate in the public debate through political expression and political association." *Id.*

39.    Restrictions that threaten core First Amendment interests, including in the election-related spending context, are generally reviewed using strict scrutiny.

40.    To survive strict scrutiny, the government must show that the restriction (1) furthers a compelling state interest and (2) is narrowly tailored to achieve that interest. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340, 343 (2010); *see also Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 721 F. Supp. 3d 31, 50 (D. Me. 2024)

(applying strict scrutiny to state statute prohibiting political campaign spending by a "foreign government-influenced entity").

41.    Nearly fifty years ago, the Supreme Court recognized in *Bellotti* that spending to promote or oppose ballot measures was expression that was at the very heart of the First Amendment's protections. 435 U.S. at 776. The Court explained: "It is the type of speech *indispensable* to decisionmaking in a democracy." *Id*. at 777 (emphasis added).

42.    The Supreme Court has been especially protective of spending in the ballot issue context, because "[c]ontributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." *Citizens Against Rent Control*, 454 U.S. at 298.

43.    The Court has been clear: "Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees *there is no significant state or public interest in curtailing debate and discussion of a ballot measure*." *Id.* at 299 (emphasis added).

44.    While the Supreme Court has held that the government may impose certain specific limited restrictions on contributions and spending in the candidate-election context, it has done so based on its conclusion that such restrictions are carefully tailored to advance the state's compelling interest in preventing real or apparent "quid pro quo" corruption—that is, the possibility that officeholders would carry political debts to their donors, who would thus exercise outsized influence over public policy. *See, e.g.*, *Buckley*, 424 U.S. at 26–27.

45.    But the Supreme Court has held that the same interest does not exist in the ballot issue context, where the people themselves vote on the policy at issue, and where that policy will remain whatever the voters approve, irrespective of donor influence. *See Bellotti*, 435 U.S. at 787

n.26, 790 ("explaining that "speak[ing] on issues of general public interest" is a "quite different context" from "participation in a political campaign for election to public office" and holding that "[t]he risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue"); *see also Sampson*, 625 F.3d at 1255 ("The legitimate reasons for regulating candidate campaigns apply only partially (or perhaps not at all) to ballot-issue campaigns."); *Bluman v. FEC*, 800 F. Supp. 2d 281, 288, 291 (D.D.C. 2011) (Kavanaugh, J.) (recognizing that the state's interest in "preventing foreign influence over the U.S. political process" raises different questions when applied to issue advocacy), *aff'd*, 565 U.S. 1104 (2012).

46.    Indeed, the Supreme Court has found that "the direct participation of the people in" approving or rejecting a ballot issue "if anything, increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *Bellotti*, 435 U.S. at 790 n.29 (cleaned up). And "[t]he inherent worth of the speech in terms of its capacity for informing the public *does not depend on the identity of its source*[.]" *Id.* at 777 (emphasis added).

47.    The Supreme Court has also made clear that First Amendment protections extend not just to individual U.S. citizens, but also to corporations and to noncitizens residing in the United States. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *Bellotti*, 435 U.S. at 783) ("Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster."); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country.").

48.    In addition to protecting the right of persons to speak on their own behalf, the First Amendment's "broad scope" also encompasses a person's right to "*receive*" speech. *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (emphasis added); *see Bellotti*, 435 U.S. at 791 n.31 ("The

First Amendment rejects the highly paternalistic approach of statutes . . . which restrict what the people may hear." (quotation marks omitted)). Thus, the First Amendment makes it "unlawful" when a State "seeks to use its full power, including the criminal law, to command where a person may get his or her information." *Citizens United*, 558 U.S. at 356; *see also id.* at 339 ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.").

49.    The First Amendment also vigorously protects a person's right of association. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). That is because "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

50.    As the Supreme Court has long recognized, "First Amendment freedoms need breathing space to survive," *NAACP v. Button*, 371 U.S. 415, 433 (1963), and therefore the Constitution requires that "[t]he government may regulate in the [First Amendment] area only with narrow specificity," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021) (quoting *Button*, 371 U.S. at 433). To protect these vital interests, laws that impede (or threaten to impede) freedom of expression and association are subject to heightened judicial scrutiny.

## FACTUAL BACKGROUND

I.    **The Kansas Constitution empowers the people to approve or disapprove legislatively-referred constitutional amendments.**

51.    The Kansas Constitution may be amended either by constitutional convention or through a legislatively-referred amendment process. Kan. Const. art. 14, §§ 1, 2.

52.     Amendments may be proposed by a concurrent resolution of two-thirds of the membership of each chamber of the legislature and then submitted to the voters for their approval or rejection by a simple majority vote. Kan. Const. art. 14, § 1.

## II.    Kansas voters recently rejected a legislatively-referred amendment that would have removed the right to abortion from the Kansas Constitution.

53.     In 2019, the Kansas Supreme Court recognized that the Kansas Constitution "protects all Kansans' natural right of personal autonomy, which includes the right to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life— decisions that can include whether to continue a pregnancy." *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, 680 (2019).

54.     The *Hodes* decision drew widespread praise from reproductive rights advocates and condemnation from anti-abortion activists and politicians. The ruling prompted anti-abortion lobbyists and special interests to press for a constitutional amendment to override the decision and remove this fundamental right from the Kansas Constitution.

55.     In March 2020, thanks to the work of a bipartisan coalition of moderate lawmakers and others who advocated in opposition to the matter, a proposed anti-abortion amendment failed to receive the requisite two-thirds majority in each chamber to be placed before the voters.

56.     After the 2020 general election changed the makeup of the Kansas Legislature, a two-thirds majority of both chambers voted to place an anti-abortion constitutional amendment on the August 2, 2022 primary ballot.

57.     The 2022 Amendment would have added a new Section 22 to the Kansas Bill of Rights, to provide that "the constitution . . . does not require government funding of abortion and does not create or secure a right to abortion."

58.     KCF, formed from a bipartisan coalition of over forty organizations, emerged as the leading group opposing the 2022 Amendment. It received donations from residents of 80 of Kansas's 105 counties and spent more than $11 million on activities opposing the 2022 Amendment.

59.     At the heart of KCF's work to oppose the 2022 Amendment was a concerted and resource-intensive effort of persuasion, that focused substantially on individual conversations with voters about the issues at stake.

60.     To this end, KCF's staff and volunteers knocked on tens of thousands of doors and talked to countless Kansas voters. They worked relentlessly to counter misinformation and purposely misleading language that was placed on the ballot by the amendment's proponents.

61.     Following these extensive and herculean advocacy efforts, on election day, Kansans overwhelmingly rejected the amendment, with 59 percent voting "no."

**III.     Kansans for Constitutional Freedom would like to work to persuade the people to similarly reject the Kansas Legislature's newest legislatively-referred proposal.**

62.     KCF would like to mount a similar effort to oppose Senate Concurrent Resolution ("SCR") 1611, a proposed constitutional amendment referred by the Kansas Legislature that, if approved by voters, would dramatically alter the current judicial selection process in Kansas.

63.     Currently, Kansas has a merit-based judicial selection process involving a nominating commission made up of lawyers and non-lawyers from across the state. The governor must appoint one of three candidates selected by the commission, and the justices are then subject to retention elections.

64.     SCR 1611 would amend the Kansas Constitution to remove the current merit-based selection process for justices of the Kansas Supreme Court and replace it with partisan elections.

65.    SCR 1611 is a direct response to the Kansas Supreme Court's recognition of fundamental reproductive rights and the defeat of the 2022 Amendment.

66.    Having failed at the ballot box, the 2022 Amendment's proponents now seek to reshape Kansas's independent judiciary into a partisan entity that will mold Kansas's constitutional jurisprudence to its political will.

67.    SCR 1611 will be presented to Kansas voters in a special election scheduled for August 4, 2026.

68.    KCF has already secured funding commitments to oppose SCR 1611 from some of the same organizational donors that supported its efforts against the 2022 Amendment. But HB 2106 directly threatens KCF's ability to engage in these planned advocacy efforts.

69.    KCF plans to educate voters about the effect of SCR 1611—including its implications for the future of abortion access in Kansas—and to persuade them to vote against the amendment. To do so, KCF must book advertising time, identify and work with vendors, and develop and implement a voter turnout strategy. Those efforts will require months of work as well as substantial funding. KCF's ability to effectively oppose SCR 1611 therefore depends on its ability to promptly begin its advocacy activities and its corresponding fundraising efforts.

## IV.    HB 2106 takes direct aim at Kansans for Constitutional Freedom's ability to advocate to support or oppose Kansas constitutional amendments.

70.    HB 2106 is another direct response to the failure of the 2022 Amendment. Rather than accept that an overwhelming majority of Kansas voters rejected the 2022 Amendment on its merits, opponents of abortion rights blamed "foreign influence" for their failure at the ballot box.

71.    Moreover, HB 2106 was meant to make it harder for KCF specifically to engage in advocacy related to Kansas constitutional ballot initiatives.

72.     Proponents of HB 2106 explicitly singled out KCF's success in advocating against the 2022 Amendment as justification for HB 2106's new prohibitions, claiming that the amendment was defeated due to "foreign-backed funds" contributed to KCF.

73.     HB 2106, through its many nested provisions, ultimately operates as a complete ban on speech about constitutional amendments in Kansas for certain disfavored speakers.

74.     HB 2106 defines "foreign national" as "(1) [a]n individual who is not a citizen or lawful permanent resident of the United States; (2) a government or subdivision of a foreign country or municipality thereof; (3) a foreign political party; (4) any entity; such as a partnership, association, corporation, organization or other combination of persons, that is organized under the laws of, or has its principal place of business in, a foreign country; or (5) any United States entity; such as a partnership, association, corporation or organization, that is wholly or majority-owned by any foreign national, unless: (1) Any contribution or expenditure that such entity makes is derived entirely from funds generated by such United States entity's United States operations; and (2) all decisions concerning the contribution or expenditure are made by individuals who are United States citizens or permanent residents, except for setting overall budget amounts." *Id.* § 25-4180(e).

75.     HB 2106 makes it a crime for any person to "accept, directly or indirectly, any contribution or expenditure from a foreign national made for any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas." *Id.* § 25-4180(d)(1). The bill's plain text includes no *mens rea* element in this provision: it is a strict liability crime. It authorizes the Kansas attorney general to "prosecute" any person who violates this prohibition, and allows "[a]ny person who believes" this prohibition has been violated to "file a complaint with the attorney general." *Id.* § 25-4180(d)(2). It also authorizes the attorney general

or the Commission to bring a civil action for an injunction and statutory damages against any alleged violator. *Id.* § 25-4180(d)(3).

76.    HB 2106 also contains several additional restrictions on issue advocacy that, although far more circuitous, are no less stifling of free speech and association. Through their breadth, vagueness, and indirect and often entirely digressive approach, these other provisions are likely to have an even more severe impact on free speech and association. They are briefly described below.

77.    K.S.A. § 25-4180(a), as amended by HB 2106, requires that "[e]very person" who "engages in any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas" and "accepts moneys or property for the purpose of engaging in such activity" must make an "annual report" to the Secretary of State identifying each person who contributed an aggregate amount of value in excess of $50 in the preceding calendar year "for such purposes." K.S.A. § 25-4180(a). In that report, they must certify that (1) they have "not knowingly accepted contributions or expenditures either directly or indirectly from a foreign national" *and* (2) "each donor named in such report is not a foreign national and has not knowingly accepted contributions or expenditures either directly or indirectly from any foreign national that in the aggregate exceed $100,000 within the four-year period immediately preceding the date of such donor's contribution or expenditure." *Id.*

78.    To effectuate this requirement, K.S.A. § 25-4180(b) requires each person who accepts any contributions and expenditures as described in subsection (a) to "require each donor to certify that such donor is not a foreign national and has not knowingly accepted contributions or expenditures either directly or indirectly from any foreign national that in the aggregate exceed $100,000 within the four-year period immediately preceding the date of such donor's contribution

or expenditure." *Id.* § 25-4180(b). For many organizations, $25,000—the average annual amount of contributions an organization could accept to avoid the statute's four-year, $100,000 cap—would constitute a small portion of their annual budget.

79.    Through these provisions, HB 2106 operates as a broad and exceedingly complex and confusing prohibition on any meaningful amount of spending related to constitutional ballot issue advocacy in Kansas based on an entity's exercise of its associational rights.

80.    By its plain terms, K.S.A. § 25-4180(a)(1) effectively prohibits *anyone* who accepts money or property for the purpose of engaging in constitutional ballot issue advocacy from engaging in such advocacy *if* they have knowingly accepted contributions or expenditures directly or indirectly from a foreign national of *any* amount and at *any* point in time.

81.    Unlike the criminal prohibition set forth in K.S.A. § 25-4180(d)(1), K.S.A. § 25-4180(a)(1) does *not* cabin its text to reach only those contributions or expenditures that were made for the purpose of promoting or opposing the adoption or repeal of a Kansas constitutional amendment.

82.    Nor does K.S.A. § 25-4180(a)(1) require that these contributions or expenditures reach a certain amount—a notable omission when compared to other provisions in HB 2106 that are triggered only where the contributions or expenditures accepted from foreign nationals total in the aggregate at least $100,000 over a four-year period. *Compare* K.S.A. § 25-4180(a)(1) (containing no threshold amount requirement), *with* K.S.A. § 25-4180(a)(2) (applying to amounts greater than $100,000), K.S.A. § 25-4180(b) (same), *and* K.S.A. § 25-4180(c) (same).

83.    By its plain terms, K.S.A. § 25-4180(a)(1) applies whenever anyone has "knowingly accepted contributions or expenditures either directly or indirectly from a foreign national." Full stop. Thus, any person who has knowingly accepted contributions or expenditures

either directly or indirectly from a foreign national cannot make the required certification and cannot lawfully engage in constitutional advocacy.

84.    K.S.A. § 25-4180(a)(2) requires any person who wishes to engage in constitutional amendment advocacy to certify that the donors listed in its report have not themselves knowingly accepted more than $100,000 in contributions or expenditures either directly or indirectly from foreign nationals, and that requirement applies to contributions and expenditures made for *any purpose*. *Compare* K.S.A. § 25-4180(d)(1) (containing a purpose requirement), *with* K.S.A. § 25-4180(a)(2) (containing no such requirement). Thus, K.S.A. § 25-4180(a)(2) has the effect of prohibiting constitutional amendment advocacy by anyone whose donors are unable or unwilling to make the required certification about their own funding.

85.    The intentional failure to file any report required by K.S.A. § 25-4180(a) is a class A misdemeanor. K.S.A. § 25-4180(i); *see also* K.S.A. § 25-4151(a) (requiring that "[e]very report or statement made under the campaign finance act" shall be made on a form containing the following language, or its substantial equivalent: "I understand that the intentional failure to file this document or intentionally filing a false document is a class A misdemeanor").

86.    As for K.S.A. § 25-4180(b)'s requirement that any person subject to subsection (a)'s certification requirements "shall require each donor to certify that such donor is not a foreign national and has not knowingly accepted contributions or expenditures either directly or indirectly from any foreign national that in the aggregate exceed $100,000 within the four-year period immediately preceding the date of such donor's contribution or expenditure," that provision has the effect of shifting HB 2106's burdensome and stifling reporting requirements onto a wide swath of potential donors, including those who are far removed from constitutional amendment advocacy.

87.    K.S.A. § 25-4180(b) on its face applies to contributions or expenditures given to the donor for *any* purpose, not just donations made for constitutional amendment advocacy. *Compare* K.S.A. § 25-4180(d)(1) (applying only to contributions or expenditures "made for any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas"), *with* K.S.A. § 25-4180(b) (containing no such limitation).

88.    In addition, the sweep of K.S.A. § 25-4180(b) is *not* limited to only the donors that are required to be listed in the report required by subsection (a); by its plain terms, it applies to *every one* of the speaker's donors. *Compare* K.S.A. § 25-4180(a)(2) (requiring a certification that covers "each donor named in [the] report [required by subsection (a)]"), *with* K.S.A. § 25-4180(b) (requiring "each donor" to make a certification, without a textual limitation to donors named in the report).

89.    K.S.A. § 25-4180(c) takes aim at—and effectively prohibits—persons from making independent expenditures in support of or against a constitutional amendment if they receive funding from foreign nationals over a certain threshold or anticipate accepting *any* amount of money from a foreign national for the remainder of the calendar year. That provision requires any person making an independent expenditure for or against a constitutional amendment to certify within 48 hours that they have not knowingly accepted more than $100,000 directly or indirectly from a foreign national within the previous four years, and that they will not accept any amount of funding from a foreign national for the rest of the year. K.S.A. § 25-4180(c). The provision applies to money received for any purpose. *Compare* K.S.A. § 25-4180(d)(1) (containing a purpose requirement), *with* K.S.A. § 25-4180(c) (containing no such requirement). Accordingly, the provision prevents anyone who received funding from foreign nationals above the statutory

threshold (or who might receive any amount in the near future) from making any independent expenditure in favor of or against a constitutional amendment.

90.    In sum, HB 2106 effectively bans the following persons or groups from engaging in "any activity promoting or opposing" a constitutional amendment: (1) any individual or organization that has knowingly accepted *any* contributions "directly or indirectly" from any foreign national, apparently for any purpose, in any amount, and without any time limitations; and (2) any individual or organization that has received contributions for the purpose of engaging in any activity promoting or opposing a constitutional amendment from any individual or organization that itself has knowingly accepted, "directly or indirectly," more than $100,000 from foreign nationals—for any purpose—in the preceding four-year period.

91.    In addition, HB 2106 bans any individual or organization from making any "independent expenditure" for "any activity promoting or opposing" a constitutional amendment if they knowingly accepted more than $100,000 from any foreign national in the previous four years—again for any purpose—or if they intend to accept any amount of money from a foreign national before the end of the calendar year, for any purpose.

92.    At the same time that HB 2106 bans a wide variety of U.S. citizens and domestic organizations from effectively engaging in constitutional ballot issue advocacy, HB 2106 has a glaring omission: although ostensibly directed toward "foreign" influence, at no place does it actually prohibit *foreign nationals themselves* from engaging in their own, direct spending to support or oppose a constitutional amendment. For example, while HB 2106 would prohibit a U.S. citizen from accepting a contribution from a foreign national "for the purpose of" purchasing an advertisement opposing a proposed constitutional amendment, it does not prohibit that *same* foreign national from directly purchasing the advertisement himself.

93.     HB 2106 became law without Governor Kelly's signature. In a statement, Governor Kelly said that she "support[s] stopping foreign influence in our elections," but that HB 2106 "goes too far."[4] She explained: "I cannot sign a bill that takes away the ability of Kansans and Kansas businesses to support elections if they accept money from overseas for any purpose, not just those related to elections. Forcing Kansans to choose between accepting financial support for any reason or surrendering their voice in the political process is wrong."[5]

## V.     HB 2106 will negatively impact Kansans for Constitutional Freedom's ability to participate in the political process.

94.     KCF, by virtue of its past activities opposing the 2022 Amendment and its planned future activities opposing SCR 1611, is a "person" who "engages in any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas" and "accepts moneys or property for the purpose of engaging in such activity." K.S.A. § 25-4180(a). KCF accordingly is—or will be—subject to the reporting and certification requirements of HB 2106, as well as its criminal provisions. Its speech and associational activities will be severely curtailed as a result.

95.     Unless enjoined, HB 2106 will have devastating consequences for KCF and organizations like it. KCF does not collect information from its individual donors regarding their citizenship status. Nor does it require its organizational donors to do so. KCF therefore cannot say whether any of its existing funds were contributed "directly or indirectly" by a foreign national. Consequently, KCF could not make the certifications required by K.S.A. § 25-4180(a)(1). As a result, when HB 2106 takes effect on July 1, 2025, KCF will be *barred* from engaging in "any

---

[4] *See Governor Kelly Vetoes Two Bills, Allows Three to Become Law Without Signature*, Office of the Governor of Kansas (Mar. 31, 2025),
https://www.governor.ks.gov/Home/Components/News/News/591/56.
[5] *Id.*

activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas."

96.    KCF also cannot make the certification required by K.S.A. § 25-4180(a)(2), which requires KCF to certify that *its donors* have not accepted contributions from foreign nationals above a statutory threshold. The plain text of (a)(2) requires that KCF be able to certify that its donors have not accepted funds from foreign nationals above this threshold—without regard to the purpose for which the funds were given to the donors, and irrespective of whether the funds came "directly or indirectly" from a foreign national. *Id.* KCF does not collect this information from its donors and the requirement that it engage in invasive questioning of any donor of the source of any funding that it has received for any purpose will directly hinder KCF's ability to raise funds to engage in the advocacy central to its purpose. There is no reason why a donor should have to provide detailed and confidential information about its own funding sources—including where that funding has nothing to do with the advocacy that the law is purportedly meant to hinder—to KCF simply because it wishes to contribute to KCF. Indeed, many donors are likely not to be able to make this certification to KCF because they may not have the underlying information that would allow them to confidently make it in the first place. Further, the requirement effectively prohibits KCF from receiving any funds from any donor that receives funding from foreign nationals over the threshold for any purpose—even if it has *nothing* whatsoever to do with KCF or the targeted advocacy. As a result, even if KCF could make the certification required by (a)(1), (a)(2) separately makes it impossible for it to continue to engage in activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas in any meaningful way. But for HB 2106, KCF would continue to solicit contributions in the future from a wide variety of potential donors, including those who would be unable or unwilling to provide KCF with the broad personal

and financial information about their own funding sources for any purpose. HB 2106's certification requirements make that impossible.

97.    In addition, HB 2106 also requires any person making independent expenditures for activities promoting or opposing a constitutional amendment to certify that the person has not knowingly accepted within the past four years "any moneys either directly or indirectly from any foreign national that in the aggregate exceed $100,000." K.S.A. § 25-4180(c). The same provision also requires the person to certify that they will not "accept any such moneys" for the remainder of the year that the amendment is on the ballot. *Id.* Because KCF does not collect information from its donors regarding their citizenship status or the sources of their funding, it cannot say whether any of the funds it has accepted were contributed "directly or indirectly" by a foreign national. Consequently, KCF would not be able to sign the certification that K.S.A. § 25-4180(c) requires after making independent expenditures. As a consequence, KCF will be prohibited from making any independent expenditure after HB 2106 goes into effect. In addition, KCF wishes to solicit funds in the future from a wide variety of potential donors during the calendar years in which constitutional amendments are on the ballot, including from donors who would be unwilling or unable to provide KCF with the information necessary for KCF to certify that it has not knowingly accepted funds directly or indirectly from a foreign national. But K.S.A. § 25-4180(c) prevents KCF from doing so without losing its right to make independent expenditures for activities promoting or opposing a constitutional amendment.

98.    Finally, HB 2106 broadly chills KCF's speech and associational rights specifically because it was plain from the legislative history that it was KCF's speech specifically that many of the bill's proponents sought to silence. During hearings before the legislature on HB 2106, proponents of the bill singled out KCF as an organization that they believed had received

substantial funding from foreign sources. Given that history, KCF must exercise extraordinary caution regarding its decisions about its funding sources and whether it can make any of HB 2106's required certifications. To do otherwise would invite likely investigations into its activities and its donors. *Cf.* K.S.A. § 25-4180(d)(2) (inviting "[a]ny person who believes the provisions of this subsection have been violated" to "file a complaint with the attorney general").

99.    Moreover, because the terms of HB 2106 are, in many ways, unclear, KCF has little guidance on the parameters of prohibited conduct.

100.    For example, HB 2106 does not define the terms "contribution" or "expenditure." But the definitions of "contribution" and "expenditure" for purposes of the Kansas campaign finance act, of which K.S.A. § 25-4180 is a part, are explicitly limited to contributions and expenditures "for the express purpose of nominating, electing or defeating *a clearly identified candidate* for a state or local office." K.S.A. § 25-4143(f), (h) (emphasis added). That definition reflects Supreme Court precedent, which has erected certain strict guardrails to ensure that restrictions related to candidate spending do not unconstitutionally impede the First Amendment. *See, e.g.*, *Buckley*, 424 U.S. at 44 & n.52; *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 189 (2003). But by its terms the definition makes no sense when applied to the words "contributions" and "expenditures" in K.S.A. § 25-4180, which deals exclusively with elections to approve or reject constitutional amendments.

101.    With respect to HB 2106's use of the term "expenditure," the confusion does not stop there. Multiple provisions of HB 2106 regulate persons who have "accepted contributions or expenditures." *See* K.S.A. § 25-4180(a)(1)-(2), (b), (d). While in theory it makes sense to "accept" a *contribution*, because that is defined as a "thing of value given to a candidate" or committee, K.S.A. § 25-4143(f), it does not make sense within the meaning of campaign finance terms of art

to "accept" an "expenditure," which the Kansas campaign finance act defines in relevant part as a "thing of value" that is "made" by a candidate or committee for the express purpose of nominating, electing, or defeating a clearly identified candidate for state or local office, K.S.A. § 25-4143(h). Since the terms "contribution" and "expenditure," as used in HB 2106, simply do not fit within the campaign finance act's definitions of those terms, the most prudent interpretation of those terms for an entity regulated by K.S.A. § 25-4180 is to give them their ordinary meaning, encompassing "contributions" or "expenditures" made for *any* purpose whatsoever.

102.    What to make of HB 2106's treatment of "independent expenditures" is even more puzzling. *See* K.S.A. § 25-4180(c). The Kansas campaign finance act defines an "independent expenditure" as "an expenditure that is made without the cooperation or consent *of the candidate or agent of such candidate intended to be benefited*, and which expressly advocates the election or defeat of a *clearly identified candidate*." K.S.A. § 25-4148c(d)(2) (emphasis added). There is no reasonable way to apply a similar definition in the context of a proposed constitutional amendment: it is not possible to receive the "cooperation or consent" of a constitutional amendment. Nor does the Kansas campaign finance act recognize committees dedicated to advocating for or against ballot issues or constitutional amendments, which might otherwise be an entity from which one could receive "cooperation or consent." *See* K.S.A. § 25-4143. Accordingly, HB 2106's regulation of "independent expenditures" apparently covers *any* expenditure made "for any activity promoting or opposing" a constitutional amendment. K.S.A. § 25-4180(c).

103.    HB 2106 also prohibits accepting "contributions" or "expenditures"—again, without any limiting definition—either "directly or indirectly" from a foreign national. The statute does not explain what "indirectly" means. How many hands must a dollar, once contributed by a foreign national, pass through before an advocacy organization like KCF may accept it? How far

must KCF trace the ultimate source of any contributions it receives? The statute provides no guidance.

104.    Thus, to avoid potential liability under K.S.A. § 25-4180 as amended by HB 2106, organizations like KCF will need to read the law in its broadest sense to avoid violating its terms, broadly chilling their political speech.

## CLAIMS FOR RELIEF

### COUNT I
### Infringement of Free Speech
### U.S. Const. amends. I & XIV, 42 U.S.C. § 1983
### Against All Defendants

105.    Plaintiff realleges and reincorporates by reference paragraphs 1–104 of this Complaint as though fully set forth herein.

106.    The First Amendment protects against the promulgation of laws "abridging the freedom of speech." U.S. Const. amend. I.

107.    The First Amendment applies to the states through the Fourteenth Amendment.

108.    Spending to promote or oppose ballot issues—including when amendments to state constitutions are presented to the electorate—is at the very heart of the First Amendment's protections. *Belotti*, 435 U.S. at 776. "It is the type of speech indispensable to decisionmaking in a democracy." *Id*. at 777.

109.    HB 2106 includes several provisions that prohibit spending on advocacy related to amending the Kansas constitution and therefore implicate the First Amendment. K.S.A. § 25-4180.

110.    Specifically, HB 2106 makes it a crime to accept contributions or expenditures from a foreign national for activities promoting or opposing a constitutional amendment. K.S.A. § 25-4180(d). The statute further prohibits a person from engaging in constitutional advocacy if the person has accepted contributions or expenditures from foreign nationals, or if their donors have

accepted contributions or expenditures from foreign nationals beyond a statutory threshold. K.S.A. § 25-4180(a). It also requires persons wishing to engage in constitutional advocacy to inquire about their donors' citizenship status and the citizenship status of their donors' donors. K.S.A. § 25-4180(b). Finally, HB 2106 prohibits persons from making any independent expenditure for or against a constitutional amendment if they have accepted more than a statutory threshold from a foreign national or intend to accept additional money from a foreign national. K.S.A. § 25-4180(c). Each of these provisions infringes upon protected First Amendment speech.

111.    The Supreme Court has long recognized that "[c]ontributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." *Citizens Against Rent Control*, 454 U.S. at 298; *see also Republican Party of N.M. v. King*, 741 F.3d 1089, 1095 (10th Cir. 2013) ("By definition, an independent expenditure is political speech[.]" (quoting *Citizens United*, 558 U.S. at 360).

112.    The Supreme Court has "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Citizens United*, 558 U.S. at 343 (quoting *Bellotti*, 435 U.S. at 776). "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co.*, 475 U.S. at 8 (quoting *Bellotti*, 435 U.S. at 783).

113.    The Supreme Court has further recognized that, "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend on the identity of the source." *Bellotti*, 435 U.S. at 777.

114.    HB 2106 infringes the speech rights of KCF because KCF has advocated for or against amendments to the Kansas constitution, it intends to do so again, and because KCF (and its donors) receives funds directly or indirectly from foreign nationals, thereby triggering HB 2106's various prohibitions.

115.    The threat that a statute will operate to chill speech is itself a constitutional harm. *See Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 658 (2004) ("Extraordinary harm and a serious chill upon protected speech may result where, as here, a prosecution is a likely possibility[.]").

116.    HB 2106 authorizes the Kansas attorney general to prosecute any person who violates K.S.A. § 25-4180(d), which states: "No person shall accept, directly or indirectly, any contribution or expenditure from a foreign national made for any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas." K.S.A. § 25-4180(d)(1); *see id.* § 25-4180(d)(2) ("The attorney general may prosecute any person who violates this subsection."). HB 2106 further allows "[a]ny person" to "file a complaint with the attorney general" when that person believes that K.S.A. § 25-4180(d)(1) has been violated. K.S.A. § 25-4180(d)(2).

117.    Courts apply "strict scrutiny" to statutes that restrict core political speech, including speech about ballot measures. *Grant v. Meyer*, 828 F.2d 1446, 1452 (10th Cir. 1987), *aff'd*, 486 U.S. 414 (1988) ("The clear import of the decisions of the Supreme Court is that restraints on political association and communication, imposed by restrictions on financing of campaigns for ballot measures, are suspect and subject to strict scrutiny."); *see also Cent. Me. Power Co*, 721 F. Supp. 3d at 50 (applying strict scrutiny to a state statute prohibiting political campaign spending by a "foreign government-influenced entity").

118.    A law may survive strict scrutiny only if the government can show that the restriction (1) furthers a compelling state interest and (2) is narrowly tailored to achieve that interest. *Citizens United*, 558 U.S. at 340.

119.    Because political speech resides at the core of First Amendment protection, the Supreme Court has allowed prohibitions on political speech only when the restriction is justified by its ability to prevent quid pro quo political corruption or its appearance. *See, e.g.*, *Cruz*, 596 U.S. at 305 ("This Court has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."); *see also Buckley*, 424 U.S. at 26–27; *King*, 741 F.3d at 1094 ("The *Buckley* framework, importantly, recognizes only a narrow governmental interest in regulating political speech—preventing corruption or the appearance of corruption.").

120.    As the Supreme Court stated when invalidating a contributions limit related to a ballot measure: "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control*, 454 U.S. at 299; *see Sampson*, 625 F.3d at 1255 ("Limits on contributions to ballot-issue committees . . . are unconstitutional because of the absence of any risk of quid pro quo corruption.").

121.    In considering limits on *candidate*-related spending, then-Judge Kavanaugh found that certain limited restrictions could also be justified by an interest in excluding noncitizens from certain activities "intimately related to the process of democratic self-government," *Bluman*, 800 F. Supp. 2d at 287 (quoting *Bernal v. Fainter*, 467 U.S. 216, 220 (1984)), but in so holding, the court was careful to emphasize that restrictions on a foreign citizen's *issue-related* advocacy would raise different constitutional questions, and the decision in *Bluman* should not be read to support such restrictions, *see id*. at 292. To the extent that another court recently read that opinion to

support the very types of restrictions that *Bluman* made clear it was not endorsing, it is plainly in error. *See OPAWL – Building AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 777–78 (6th Cir. 2024).

122.    The Supreme Court has also made clear that "the fact that advocacy may persuade the electorate is hardly a reason to suppress it[.]" *Bellotti*, 435 U.S. at 790. Rather, "the direct participation of the people in a referendum, if anything, increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *Id.* at 790 n.29 (cleaned up).

123.    Unlike candidate-related elections, ballot issue elections do not raise the risk of "quid pro quo" corruption, where a candidate's ongoing and post-election policy decisions may be implicitly influenced by their donors. *See, e.g.*, *Buckley*, 424 U.S. at 26–27; *Bellotti*, 435 U.S. at 791 (1978) ("The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." (internal citations omitted)); *Sampson*, 625 F.3d at 1255 (same).

124.    Because the only legitimate justification of regulations that prohibit political speech is to eliminate quid pro quo corruption or its appearance, *Cruz*, 596 U.S. at 305, and because that justification is irrelevant in the ballot issue context, *Citizens Against Rent Control*, 454 U.S. at 299, HB 2106 is unconstitutional under strict scrutiny.

125.    Even if Kansas *could* have a compelling interest in preventing foreign nationals from spending money to advocate for or against amendments to the Kansas constitution, HB 2106 is not appropriately tailored to serve that goal. As described above, it is both overinclusive and underinclusive. It prohibits speech by U.S. citizens based on their receiving contributions from foreign nationals that may be wholly unrelated to constitutional amendments. And it simultaneously allows those *same* foreign nationals to engage in direct spending to promote or

oppose constitutional amendments. The reason why is clear: HB 2106 is tailored not to protect Kansas elections from foreign influence, but instead to hamstring KCF and other groups of Kansas citizens.

126.    HB 2106 separately triggers strict scrutiny because it is an impermissible content-based restriction: it prohibits certain disfavored speakers (foreign nationals and those who accept contributions and expenditures from them) and speech about certain topics (amendments to the Kansas Constitution) associated with a particular form of expression (contributions and expenditures).

127.    Other federal courts considering similar regulations have held that when a law "singles out particular political speech—that which advocates the defeat of a candidate and/or supports the election of her opponents—for negative treatment that the state applies to no other variety of speech," it "'by [its] terms distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed,' and thus it cannot be content-neutral." *Day v. Holahan*, 34 F.3d 1356, 1360–61 (8th Cir. 1994) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994)). As a result, such laws are subject to strict scrutiny. *Id.*

128.    The same is facially true of HB 2106, and it cannot survive strict scrutiny for the reasons explained above.

129.    HB 2106 unconstitutionally restricts the First Amendment speech rights of KCF and others like it because it burdens core political speech and is a content-based restriction; and it is not narrowly tailored or sufficiently related to any compelling, or even legitimate or important, government interest.

## COUNT II
### Infringement of Associational Rights
### U.S. Const. amends. I & XIV, 42 U.S.C. § 1983
### Against All Defendants

130.    Plaintiff realleges and reincorporates by reference paragraphs 1–129 of this Complaint as though fully set forth herein.

131.    The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama*, 357 U.S. at 460; *see also Hadnott v. Amos*, 394 U.S. 358, 364 (1969) ("First Amendment rights [] include the right to band together for the advancement of political beliefs.").

132.    HB 2106 infringes the associational rights of noncitizens, as well as those individuals and organizations who wish to associate with them. Political spending is not just an individual act of expression, but "enables like-minded persons to pool their resources in furtherance of common political goals." *Buckley*, 424 U.S. at 22. This is especially true for processes like amending the constitution of Kansas, where potential amendments are submitted to the electorate for approval or rejection, *see* Kan. Const. art. XIV, § 1, allowing individuals to use the collective power of their voices and votes to write their views into law.

133.    Specifically, the criminal prohibition on persons accepting contributions or expenditures from foreign nationals for activities promoting or opposing a constitutional amendment (K.S.A. § 25-4180(d)); the prohibition on constitutional advocacy of persons who have accepted contributions or expenditures from foreign nationals, or whose donors have accepted more than a specified amount of contributions or expenditures from foreign nationals (K.S.A. § 25-4180(a)); the requirement that persons wishing to engage in constitutional advocacy must demand that their donors make certifications about their citizenship status and the citizenship status

of their own donors (K.S.A. § 25-4180(b)); and the prohibition on persons making independent expenditures for or against a constitutional amendment if they have accepted moneys above a statutory threshold from foreign nationals or intend to accept additional money from a foreign national (K.S.A. § 25-4180(c)) all infringe upon associational rights because they prohibit U.S. individuals and organizations from associating with foreign nationals, and vice versa.

134.    KCF can no longer freely associate with noncitizens who wish to support its causes and its work advocating for and against amendments to the Kansas Constitution, without fear that doing so would make KCF unable to continue to engage in such advocacy, or that it would make KCF, its staff or volunteers, and the noncitizens vulnerable to invasive government investigation and even potentially prosecution. In addition, HB 2106's invasive and burdensome requirements are likely to discourage former donors and potential future donors from associating with KCF. *See, e.g.*, *Bonta*, 594 U.S. at 610 ("When it comes to a person's . . . associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution." (cleaned up)).

135.    HB 2106's enforcement provision, allowing the Kansas attorney general to prosecute persons who he believes have violated HB 2106's prohibition on accepting contributions or expenditures from foreign nationals for purposes of constitutional amendment advocacy, and allowing "[a]ny person" who believes that provision has been violated to file a complaint with the attorney general, K.S.A. § 25-4180(d), further threatens to chill Plaintiff's associational rights. *See Bonta*, 594 U.S. at 618–19 ("When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause

First Amendment freedoms need breathing space to survive.'" (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963))).

136.    These burdens on KCF's associational rights trigger strict scrutiny. Infringements on the right of association "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623; *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Bonta*, 594 U.S. at 610 ("The government may regulate in the [First Amendment] area only with narrow specificity'") (quoting *Button*, 371 U.S. at 433).

137.    HB 2106, for the same reasons described above, cannot pass strict scrutiny. None of the provisions in HB 2106 is supported by a state interest sufficient to justify the resulting restrictions on the right of Kansas citizens, organizations, and entities to freely associate with foreign nationals. And the law is not narrowly tailored, or even sufficiently related, to serve any interest that could justify the burden imposed on associational rights.

**COUNT III**
**First Amendment Against K.S.A. § 25-4180(d)**
**U.S. Const. amends. I & XIV, 42 U.S.C. § 1983**
**Against All Defendants**

138.    Plaintiff realleges and reincorporates by reference paragraphs 1–137 of this Complaint as though fully set forth herein.

139.    "Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). This may occur for many reasons, including when "[a] speaker may be unsure about the side of a line on which his speech falls," a "worry that the legal system will err, and count speech that is permissible as instead not," or when an individual "may simply be concerned about the expense of becoming entangled in the legal system." *Id.* "The result is 'self-censorship' of speech that could not be proscribed." *Id.*

140.    To counteract that chilling effect, the Supreme Court has frequently held that the government may impose civil or criminal liability on speech only if liability is "condition[ed] . . . on the State's showing of a culpable mental state." *Id*.; *see also id.* at 76–77 (discussing instances in which the Court recognized that a culpable *mens rea* requirement is necessary for a statute to comport with the First Amendment); *id.* at 80 (noting that the culpable *mens rea* requirement has applied "in both civil and criminal contexts").

141.    The Supreme Court has generally required at least subjective recklessness, and sometimes more culpable mental states, before allowing the government to impose liability based on speech. *Id.* at 77–79 & n.5.

142.    The precise level of culpability that the First Amendment requires before allowing the government to impose liability based on a particular type of speech depends on a balance that considers on one hand "the constitutional interest in free expression, and . . . the correlative need to take into account . . . prosecutions' chilling effects," and on the other, "the competing value in regulating historically unprotected expression." *Id*. at 79–80 (cleaned up). That analysis depends on how far the "protected speech" that is likely to be chilled is "from the First Amendment's central concerns." *Id.* at 81.

143.    For example, while the Court has held that "incitement" may be proscribed, the Court has required a showing of "specific intent, presumably equivalent to purpose or knowledge." *Id.* at 81; *see also id.* at 73 (defining incitement as "statements directed at producing imminent lawless action" (cleaned up)). Because "incitement to disorder is commonly a hair's-breadth away from political 'advocacy,'" *id.* at 81, a heightened *mens rea* standard *above* recklessness was necessary "to ensure that efforts to prosecute incitement would not bleed over, either directly or

through a chilling effect, to dissenting political speech," which is "at the First Amendment's core," *id.*

144. Spending to promote or oppose ballot issues, such as when state constitutional amendments are submitted to voters for approval, lies at the heart of the First Amendment's protections. *See Bellotti*, 435 U.S. at 776. "It is the type of speech indispensable to decisionmaking in a democracy." *Id.* at 777.

145. Because "[c]ontributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression," *Citizens Against Rent Control*, 454 U.S. at 298, this type of speech deserves at least as much protection as the speech recognized in the Supreme Court's incitement cases, *see Counterman*, 600 U.S. at 81 (discussing the need for a heightened *mens rea* requirement for speech that is "a hair's-breadth away from political 'advocacy'"). Consequently, Kansas may not impose civil or criminal liability for contributions related to advocacy directed at an amendment to the Kansas constitution without requiring proof of a mental state of "purpose or knowledge." *Id.*

146. HB 2106 purports to impose civil and criminal liability on individuals for core political speech without the need for Kansas to prove *any* mental state.

147. Specifically, HB 2106 imposes civil and criminal liability on any person who "accept[s], directly or indirectly, any contribution or expenditure from a foreign national made for any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas." K.S.A. § 25-4180(d)(1). The statute authorizes the attorney general to "prosecute" any person who violates that subsection, K.S.A. § 25-4180(d)(2), and authorizes the attorney general or the Governmental Ethics Commission to seek statutory damages against any person who violates that subsection, K.S.A. § 25-4180(d)(3).

148. HB 2106 added multiple subsections to K.S.A. § 25-4180; nearly all of them contain an explicit, heightened *mens rea* requirement of "knowledge" in their operative provisions. *See* K.S.A. § 25-4180(a)(1) (regulation of persons who "knowingly accepted contributions or expenditures"); *id.* § 25-4180(a)(2) (regulation concerning donors who "knowingly accepted contributions or expenditures"); *id.* § 25-4180(b) (requiring donors to certify that they have not "knowingly accepted contributions or expenditures"); *id.* § 25-4180(c) (requiring certification that speaker "has not knowingly accepted any moneys").

149. In stark contrast, K.S.A. § 25-4180(d)—which imposes both civil and criminal liability for its violation—does not contain *any* requirement of proof of mental state.

150. When a legislature "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." *City & Cnty. of San Francisco v. Envt'l Protection Agency*, 604 U.S. ---, 145 S. Ct. 704, 713–14 (2025) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). The Supreme Court has "invoked this canon time and time again." *Id.* at 14. Consequently, the Kansas legislature's choice to include a "knowingly" *mens rea* requirement in multiple provisions of HB 2106, but to decline to include any *mens rea* requirement in K.S.A. § 25-4180(d) can only be interpreted to mean that the Kansas legislature did not intend K.S.A. § 25-4180(d) to require proof of any particular mental state.

151. K.S.A. § 25-4180(d) therefore imposes both civil and criminal liability on persons who accept a covered "contribution or expenditure," even when the person does so "recklessly" or "negligently"—or even non-negligently. It is a strict liability crime.

152.    None of those mental states are constitutionally sufficient to protect against the chilling effect on protected speech that will result from the potential criminal and civil liability created by K.S.A. § 25-4180(d).

153.    Accordingly, K.S.A. § 25-4180(d) is unconstitutional under the First Amendment. *See Counterman*, 600 U.S. at 77–81; *see also State v. Boettger*, 310 Kan. 800, 822–23 (2019) (holding unconstitutional a Kansas statute that criminalized threats of violence made with a *mens rea* of "recklessness").

### COUNT IV
**Overbreadth**
**U.S. Const. amends. I & XIV, 42 U.S.C. § 1983**
**Against All Defendants**

154.    Plaintiff realleges and reincorporates by reference paragraphs 1–153 of this Complaint as though fully set forth herein.

155.    HB 2106 is unconstitutional under the First Amendment and the Due Process Clause of the Fourteenth Amendment because it is facially overbroad.

156.    "[A] statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). That is because "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *Id.* Even if a law is constitutional in some of its applications, it is facially unconstitutional if it is substantially overbroad relative to its "plainly legitimate sweep." *Id.*

157.    Overbreadth challenges have also been successful where associational rights were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations in addition to speech. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

158.     HB 2106 is substantially overbroad because it regulates speech related to advocacy for or against amendments to the Kansas Constitution—including when proposed amendments are submitted by ballot to the state's voters for their approval or rejection. As the Supreme Court has held, ballot issue-related spending is speech entitled to the First Amendment's highest protections; thus, HB 2106's infringement upon it sweeps in an enormous amount of speech entitled to the constitution's most profound and significant protections.

159.     The fact that HB 2106 targets core political speech related to state constitutional amendments, which are submitted to the voters via the ballot and therefore lack any constitutionally permissible justification for its restrictions, is sufficient to render the law unconstitutional. But even if Kansas could have a sufficiently important interest in preventing foreign nationals from spending money to advocate for or against amendments to the Kansas Constitution, HB 2106 extends far broader than necessary to further that interest, encumbering huge amounts of *American citizen* speech.

160.     If a U.S. individual or organization knowingly accepts any contribution or expenditure, directly or indirectly, from a foreign national—even a *de minimis* amount—that American speaker is entirely prohibited from engaging in "any activity promoting or opposing" a constitutional amendment. K.S.A. § 25-4180(a)(1). The same is true for U.S. individuals and organizations whose donors cannot or will not make the required certifications about themselves and their donors. K.S.A. § 25-4180(a)(2), (b). HB 2106 also flatly prohibits U.S. individuals and organizations from making independent expenditures if they cannot make the required certifications about their past or future funding. K.S.A. § 25-4180(c).

161.     HB 2106 prevents American citizen speakers from augmenting the reach of their speech by soliciting funds from foreign nationals. K.S.A. § 25-4180(d); *id.* § 25-4180(a)-(c).

162.    HB 2106 applies to a huge range of persons and entities, even individuals and nonprofit organizations whose primary purpose has nothing to do with politics.

163.    HB 2106 unnecessarily chills the core speech and associational rights of KCF and others similarly situated who seek to engage in advocacy for or against amendments to the Kansas constitution.

164.    In short, even if HB 2106 were justified by a constitutionally appropriate purpose, it would nonetheless sweep in an unduly broad amount of lawful speech and therefore is unconstitutionally overbroad.

## COUNT V
### Vagueness
### U.S. Const. amend. XIV, 42 U.S.C. § 1983
### Against All Defendants

165.    Plaintiff realleges and reincorporates by reference paragraphs 1-164 of this Complaint as though fully set forth herein.

166.    HB 2106 is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

167.    "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Laws can be vague either because they (1) fail to inform people of what they prohibit or (2) lend themselves to arbitrary and discriminatory enforcement. *See City of Chicago v. Morales*, 527 U.S. 41, 58–59 (1999); *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972).

168.    "When speech is involved, rigorous adherence to [the requirements of the void for vagueness doctrine] is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

169.    Multiple parts of HB 2106 are unconstitutionally vague.

170.    *First*, HB 2106 does not define the terms "contribution" or "expenditure." The definitions of "contribution" and "expenditure" for purposes of the Kansas campaign finance act, of which K.S.A. § 25-4180 is a part, are explicitly limited to contributions and expenditures "for the purpose of nominating, electing or defeating a clearly identified candidate for a state or local office." K.S.A. § 25-4143(f), (h). But that definition makes no sense when applied to the terms "contributions" and "expenditures" in K.S.A. § 25-4180, which deals exclusively with elections to approve or reject constitutional amendments. So what do these terms mean? Either (1) they refer to *all* contributions and expenditures, for whatever purpose, in which case the law is overbroad for the reasons explained above, or (2) there is some unspoken, hidden limitation on the types of contributions and expenditures that trigger HB 2106's onerous certification requirements, in which case the law both fails to place the public on notice of what it prohibits, and invites arbitrary enforcement.

171.    Indeed, in *Buckley v. Valeo*, the Supreme Court held that Federal Election Campaign Act's definition of covered "contributions" and "expenditures" as those made "for the purpose of influencing" an election "raises serious problems of vagueness." 424 U.S. at 76–77. Here, HB 2106 gives even *less* guidance as to the nature of the "contributions" and "expenditures" that are covered by its prohibitions.

172.    *Second*, echoing the definitions that the Supreme Court found in *Buckley* "raise[] serious problems of vagueness," 424 U.S. at 76, HB 2106 applies to "[e]very person who engages in any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas" and "accepts moneys or property for the purpose of engaging in such activity." Kan. Stat. § 25-4180(a). The statute provides no further guidance on what it means to accept moneys or property "for the purpose of engaging in" "activity promoting or opposing the

adoption or repeal of any provision of the constitution of the state of Kansas." This is just as vague, if not more so, than "for the purpose of influencing an election." And in *Buckley*, the Supreme Court held the "phrase, 'for the purpose of . . . influencing'" carried an unconstitutional "potential for encompassing both issue discussion and advocacy of a political result." *Buckley*, 424 U.S. at 79.

173.    Although the Supreme Court has held that words like "'promote,' 'oppose,' 'attack,' and 'support'" "provide explicit standards for those who apply them," the provisions the Court analyzed contained the *additional* requirement that the candidate be "clearly identified." *McConnell*, 540 U.S. at 170 & n.64; *see also F.E.C. v. Wis. Right to Life, Inc.*, 551 U.S. 449, 495 (2007); *cf. Yamada v. Snipes*, 786 F.3d 1182, 1192 (9th Cir. 2015) (upholding, against a vagueness challenge, a definition of "advertisement" that included a requirement that the communication "identifies an issue or question that will appear on the ballot at the next applicable election"). HB 2106 contains no such identification requirement.

174.    As a result, even if a constitutionally relevant distinction *could* be drawn between general issue advocacy and advocacy for or against a particular constitutional amendment, HB 2106 fails to adequately draw that line. Consider the context of the 2022 Amendment: would spending money on an issue advertisement generally exhorting Kansans to support abortion rights be "activity promoting or opposing" the adoption of the 2022 Amendment? Would a grant to KCF made with the express proviso that it be spent supporting abortion rights be made "for the purpose of" such activity, thus triggering Section 25-4180(a)? What if an individual wrote a book about their pro-choice views and talked about why measures like the 2022 Amendment should be defeated? Would that implicate section (a) and if that person received funding from foreign citizens

(e.g. in helping research, write, and publish the book), would they be prohibited from publishing? All this is left unanswered by HB 2106.

175.    *Third*, HB 2106 prohibits accepting "contributions" or "expenditures"—again, without any limiting definition—either "directly or indirectly" from a foreign national. The statute does not explain what "indirectly" means. How many hands must a dollar, once contributed by a foreign national, pass through before an advocacy organization like KCF may accept it? How far must KCF trace the ultimate source of any contributions it receives? Again, the statute provides no guidance.

176.    *Fourth*, HB 2106's treatment of "expenditures" is so nonsensical as to fail to give notice of what it prohibits and invite arbitrary enforcement. Sections 25-4180(a)(2), (b), and (d)(1), as amended, collectively operate to prohibit any covered person from accepting contributions "or expenditures" from foreign nationals or those who associate with them. But that makes no sense in this context. How does one accept an "expenditure"? And how does that act distinguish itself from accepting a "contribution"? That distinction must mean something, because Kansas courts "do not interpret statutes in such a manner as to render portions superfluous or meaningless." *State v. Roeder*, 300 Kan. 901, 923 (2014). It would be reasonable to conclude that an organization like KCF "accepts" an "expenditure" merely when another organization that shares its position on a constitutional amendment spends its own money to advocate for that position. And the lack of an explicit "purpose" limitation for contributions and expenditures in certain parts of the statute, described above, further compounds the vagueness problems.

177.    *Fifth,* HB 2106's separate provision for "independent expenditures" is even more puzzling. The Kansas campaign finance act defines an "independent expenditure" as "an expenditure that is made without the cooperation or consent *of the candidate or agent of such*

*candidate intended to be benefited* and which expressly advocates the election or defeat of a *clearly identified candidate*." K.S.A. § 25-4148c(d)(2) (emphasis added). That plainly makes no sense in the context of a constitutional amendment campaign, which may be supported by any number of disparate individuals, groups, or organizations.

178.    Moreover, the "independent expenditure" certification requirement in K.S.A. § 25-4180(c) speaks not in terms of "contributions" or "expenditures" but instead requires a speaker to certify that it has not received (and will not receive) any "moneys" from foreign nationals, directly or indirectly. Whatever (unspecified) limitation might be read into the use of the terms "contributions" and "expenditures" elsewhere in the statute, the even more imprecise term "moneys" cannot be so limited. On its face, the term seems to sweep in *any* income, from whatever source, that has as its ultimate source any foreign national—to include "any United States entity . . . that is wholly or majority-owned by any foreign national." K.S.A. § 25-4180(e)(5).

179.    None of these provisions is "readily susceptible to a narrowing construction that will remedy the constitutional infirmity." *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194 (10th Cir. 2000). And "[e]ven assuming that a more explicit limiting interpretation of the statute could remedy the flaws we have pointed out, [courts] are without power to remedy the defects by giving the statute constitutionally precise content." *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1239 (10th Cir. 2023) (cleaned up).

180.    K.S.A. § 25-4180, as amended by HB 2106, is therefore void for vagueness, both facially and as applied.

**COUNT VI**
**Due Process**
**U.S. Const. amend. XIV, 42 U.S.C. § 1983**
**Against All Defendants**

181.    Plaintiff realleges and reincorporates by reference paragraphs 1–180 of this Complaint as though fully set forth herein.

182.    When a legislature enacts a law that operates retroactively, the demands of "due process . . . may sometimes bar its way." *De Niz Robles v. Lynch*, 803 F.3d 1165, 1170 (10th Cir. 2015).

183.    Even if HB 2106 represented a lawful regulation of speech relating to the promotion or opposition of constitutional amendments on a going-forward basis, "[i]t does not follow, however, that what [the Kansas legislature] can legislate prospectively it can legislate retrospectively." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976). "The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Id.* at 17; *see Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984) ("[R]etroactive legislation does have to meet a burden not faced by legislation that has only future effects.").

184.    Accordingly, unless "the retroactive application of the legislation is itself justified by a rational legislative purpose," *id.* at 730, then it would violate due process to give HB 2106 retroactive effect.

185.    In previous cases where the Supreme Court has upheld retroactive laws against Due Process challenges, it normally has done so after concluding that Congress could have viewed the statute's retroactive effect as a rational way to allocate financial burdens resulting from the law or to otherwise avoid economic harm. *See, e.g.*, *Turner Elkhorn*, 428 U.S. at 18 (upholding retroactive imposition of liability on mine operators for certain medical conditions caused by mining as "a

rational measure to spread the costs of the employees' disabilities"); *Pension Ben. Guar. Corp.*, 467 U.S. at 730–31 (upholding statute because it was rational for Congress to legislate retroactively to reduce the likelihood of employers withdrawing from multiemployer pension plans); *United States v. Sperry Corp.*, 493 U.S. 52, 64–65 (1989) (upholding retroactive effect of a statute in part to avoid one class of claimants to the Iran-United States Claims Tribunal having to shoulder disproportionate costs while another class "would have obtained a windfall").

186.    By contrast, the Supreme Court has strongly indicated that it would be improper for a State to impose retroactive liability based on a theory of "deterrence" or "blameworthiness." *Turner Elkhorn*, 428 U.S. at 17–18 ("[W]e would nevertheless hesitate to approve the retrospective imposition of liability on any theory of deterrence or blameworthiness[.]" (citations omitted)).

187.    HB 2106 imposes improper, retroactive punishment on KCF and other entities who lawfully accepted contributions and expenditures from (1) foreign nationals and (2) donors who had themselves accepted contributions and expenditures from foreign nationals.

188.    As explained above, HB 2106 bars KCF from engaging "in any activity promoting or opposing" a constitutional amendment unless KCF can certify that it "has not knowingly accepted contributions or expenditures either directly or indirectly from a foreign national," without any temporal limitation. K.S.A. § 25-4180(a)(1). By its plain terms, that provision has the effect that any person who has *ever* knowingly accepted contributions or expenditures from a foreign national—even before HB 2106 went into effect—is *forever* barred from supporting or opposing a constitutional amendment.

189.    Similarly, HB 2106 bars a person from engaging in constitutional advocacy for up to four years if the person has accepted contributions or expenditures from a donor that knowingly

accepted more than $100,000 in contributions or expenditures from any foreign national in the past four years. K.S.A. § 25-4180(a)(2).

190.     The statute also prohibits a potential donor from giving money to support or oppose a constitutional amendment for the four-year period after the donor knowingly accepted more than $100,000 from any foreign national. K.S.A. § 25-4180(b).

191.     Each of those provisions retroactively imposes a draconian penalty (an outright prohibition of core political speech) based on conduct that was entirely lawful at the time (accepting contributions and expenditures from foreign nationals).

192.     Even if HB 2106 was a lawful means to prospectively regulate political speech (which it is not), there still would be no rational basis for its retroactive application. Unlike the mine run of cases in which the Supreme Court upheld retroactive application of a law, HB 2106 is a direct regulation of political speech, and it cannot be justified as a rational way to share financial burdens or to otherwise prohibit negative distortion of economic activity. And the Supreme Court has already indicated that any potential justification based on "deterrence" or "blameworthiness" of the then-lawful conduct is unavailable. *Turner Elkhorn*, 428 U.S. at 17–18.

193.     If the ostensible purpose of HB 2106 was to limit foreign influence on the Kansas constitutional amendment process, that interest would be fully served by HB 2106 operating only prospectively. That interest could not possibly be served by retroactive application of the law.

194.     Accordingly, even if the Court were to uphold HB 2106 in other respects, the statute cannot constitutionally be applied to KCF based on its acceptance of funds from foreign nationals before the law's effective date, or based on acceptance of funds from foreign nationals by either KCF or its donors from foreign nationals during the last four years.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

A. Declaring that HB 2106 violates the First and Fourteenth Amendments to the U.S. Constitution;

B. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from taking any steps to implement and enforce HB 2106;

C. Awarding Plaintiff its costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

D. Granting such other and further relief as the Court deems just and proper.

By: _____

Pedro L. Irigonegaray (#08079)
Nicole Revenaugh (#25482)
**IRIGONEGARAY & REVENAUGH**
1535 S.W. 29th Street
Topeka, KS 66611
(785) 267-6115
pedro@itrlaw.com
nicole@itrlaw.com

Elisabeth C. Frost* (D.C. 1007632)
Joshua C. Abbuhl* (D.C. 1044782)
Richard A. Medina* (D.C. 90003752)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: 202-968-4490
efrost@elias.law
jabbuhl@elias.law
rmedina@elias.law

*Attorneys for Plaintiff*

*\* Pro hac vice applications forthcoming*