# EXHIBIT A

# IN THE UNITED STATES COURT
# FOR THE DISTRICT OF KANSAS

KANSANS FOR CONSTITUTIONAL
FREEDOM,

    *Plaintiff,*

  v.

KRIS KOBACH, et al.,

    *Defendants.*

No.: 2:25-CV-02265-DDC-GEB

## BRIEF OF AMERICANS FOR PUBLIC TRUST AND HONEST ELECTIONS PROJECT AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Bradley J. Schlozman (KS Bar #17621)
**HINKLE LAW FIRM LLC**
1617 N. Waterfront Parkway, Ste. 400
Wichita, KS 67206
Tel: (316) 660-6296
E-mail: bschlozman@hinklaw.com

Jason Torchinsky (Va. Bar No. 47481)
**HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC**
15405 John Marshall Hwy.
Haymarket, VA 20169
Tel: (540) 341-8808
E-mail: jtorchinsky@holtzmanvogel.com

*Counsel for Proposed Amici Americans for Public Trust and Honest Elections Project*

# INTEREST OF *AMICI CURIAE*

Americans for Public Trust ("APT") is a nonprofit, nonpartisan organization committed to exercising vigilant oversight and restoring trust in government by exposing corruption and holding politicians and political groups accountable for corrupt and unethical behavior. To further this mission, APT uses in-depth investigations and legal action to help promote open and transparent government and ensure that those who disregard the rule of law are held accountable. It also seeks to raise public awareness of this work through reporting and disseminating information about the powerful being held accountable for their misconduct to help rebuild public trust. APT has a significant interest in this case because it is concerned about the potential for foreign contributions to affect the decision-making of state elected officials, and it supports the State of Kansas's efforts to combat such influence.

The Honest Elections Project (the "Project") is a nonpartisan organization devoted to supporting the right of every lawful voter to participate in free and honest elections. Through public engagement, advocacy, and public-interest litigation, the Project defends the fair, reasonable measures that state legislatures put in place to protect the integrity of their voting processes. The Project supports commonsense voting rules and opposes efforts to reshape elections for partisan gain. It has a significant interest in this case as this challenge implicates the constitutional power of all state legislatures to craft rules that limit foreign influence in elections and could potentially call into question the legality of similar state laws across the nation.

**ARGUMENT**

The U.S. Constitution entrusts primary authority to regulate voting and elections to the state legislatures, ultimately subject to the checks and balances of the Federal Congress. *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019). "Preserving the integrity of the electoral process" has long been recognized by the U.S. Supreme Court as a compelling interest. *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986). Towards this end, the Court has upheld laws to exclude foreign citizens from "activities of democratic self-government" by denying them "rights and privileges that U.S. citizens possess." *Bluman v. FEC*, 800 F. Supp. 2d 281, 287-88 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012).

The government's power to exclude foreign citizens from certain aspects of democratic life is perhaps strongest when it aims to limit foreign influence in elections. The case for restraining and eliminating foreign influence on the vote has a pedigree stretching from Washington's "Farewell Address" to modern Foreign Agents Registration Act ("FARA") and Federal Election Campaign Act ("FECA") regulations. *See OPAWL - Building AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 780 (6th Cir. 2024) ("*Yost*").

These regulations *do* restrict the actions of foreigners by preventing them from spending their money to influence the outcomes of American elections. That's the point. And in fact, it's exactly the kind of lawful action that should survive a First Amendment challenge, because it serves an incredibly compelling interest in a

manner narrowly tailored to meet the needs of the political community. In fact, the Sixth Circuit explicitly said as much when it upheld Ohio's statute banning foreign money in the State's elections. *Id.* at 785.

Further, recognizing that information about who or what influences elections is difficult to determine before regulations take effect, courts have given states wide leeway to regulate in this area of law. *See id.* at 781 (citing *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1053 (6th Cir. 2015) and *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010)). And this leeway is necessary: states are faced with an enormous variety of potential loopholes and back-doors that can be exploited by foreign agents to gain a foothold in American democracy. *See, e.g., id.* at 783 (hypothesizing a possible loophole where noncitizens could "buy" a $20,000 yard sign from a citizen to circumvent spending prohibitions).

Exercising its constitutional authority to regulate elections and keep them free of foreign influence, the State of Kansas enacted H.B. 2106. 2025 Kansas Laws Ch. 27. The law bars noncitizens from spending money to influence Kansas' elections both directly and indirectly, and a crucial component for its success is the measures it includes to close a well-known loophole that would otherwise frustrate H.B. 2106's important objectives. To do this, the law establishes a threshold limit of $100,000 in funds received from foreign sources for express advocacy purposes over a four-year period which, once hit, would bar the recipient person or entity from engaging in political spending for the remainder of the election cycle. *Id.* § 1(a)-(d). Simply put,

4

the statute prohibits foreigners from laundering their political contributions or expenditures through stateside donors. Kansas, as detailed, *infra* at 11-12, has substantial reason to be concerned about the influence of foreign donors on its policy decisions.

The concern about foreign money in politics is even more serious in the context of ballot initiatives. Ballot initiatives represent the purest form of democratic self-governance. Unlike representative elections, in which voters select individuals to make decisions on their behalf, referenda and constitutional amendment campaigns empower the electorate to directly enact or reject laws and foundational governing principles. In this context, the people do not merely choose policymakers—they *are* the policymakers. The exercise of direct democracy through ballot measures is not a peripheral feature of our constitutional order; it is a central manifestation of popular sovereignty.

Given this direct link to the core of democratic self-rule, it is not only appropriate but imperative for states to safeguard these processes from foreign influence. If there is a compelling interest in preventing foreign nationals from contributing to campaigns involving candidates—who are themselves steps removed from the legislative process—then that interest is even more acute when foreign actors seek to influence the voters themselves as they wield legislative power directly.

Foreign contributions to ballot initiative campaigns risk distorting the deliberative processes of the electorate in precisely the same way, if not more so, than

5

contributions to candidate campaigns. They introduce external influences into decisions that are supposed to reflect the considered will of the state's citizens. In the case of constitutional amendments, where the consequences are often far-reaching and irreversible, the need to ensure that such decisions are made solely by and for the people of the state is especially pressing.

Courts have long acknowledged that the integrity of electoral processes is a compelling government interest. As the Sixth Circuit recently observed, that interest reaches its apex in the context of ballot initiatives, where the electorate acts as sovereign legislator. *See Yost*, 118 F.4th at 778. Protecting the initiative process from foreign financial influence is not a restriction on speech for its own sake, but a targeted measure to preserve the fundamental premise that self-government must be by the people and for the people—not influenced or manipulated by foreign entities with no stake in the polity's future.

Maintaining public confidence in the integrity of the vote is "critical . . . to democracy." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (plurality opinion)). The ability to spend money to influence votes is incredibly powerful—indeed, John Adams wrote that, in America, "every Man who can and will influence One Man to vote besides himself" was as powerful as "an Aristocrat" in the English Monarchy. Letter from John Adams to John Taylor (Apr. 16, 1814) https://founders.archives.gov/documents/Adams/99-02-02-6279. Foreigners should

not be aristocrats in our republic. To stop that from happening, to maintain the integrity of its elections and ballot initiatives, and to shore up public confidence in its democratic institutions, Kansas has elected to comprehensively ban the influence of foreign money in politics. This welcome action is necessary to preserve Kansas' democratic community, and it is well within the established case law governing state-level regulation and proscription of foreign influence in politics.

## I. Kansas is Merely the Latest State to Lawfully Restrict Foreign Influence in its Elections.

With the passage of H.B. 2106, Kansas joined the growing number of states that have adopted laws aimed at restricting foreign participation in, and influence on, their electoral processes. States have varied, to a certain degree, in their regulatory approaches to this issue. Some states have adopted broader definitions as to who qualifies as a foreign national for the purposes of their prohibition or specified that their prohibitions apply only to certain types of state elections, but not others. The majority of provisions in H.B. 2106, however, have already existed in other States' election codes and Courts have repeatedly upheld such provisions against challenges not substantially different than the one brought here.

In 2020, Washington enacted a statute prohibiting foreign nationals (defined, as does H.B. 2106, to include individuals who are neither U.S. citizens nor lawful permanent residents) from contributing to candidates or political committees, and from making expenditures supporting or opposing candidates or ballot measures. Rev. Code Wash. § 42.17A.005(24)(a). Importantly, Washington's statute explicitly

prohibits *any person*—including U.S. citizens and lawful permanent residents—from making contributions or expenditures, and from sponsoring political advertising or electioneering communications, that are "financed *in any part* by a foreign national" or if a foreign national is "involved in making decisions regarding the contribution, expenditure, political advertising, or electioneering communication *in any way*." Rev. Code Wash. § 42.17A.417 (emphases added). Although formulated in different ways, both H.B. 2106 and Washington's statute were designed to cast a broad net reaching even the political speech and issue advocacy of U.S. Citizens. This breadth is necessary in order to effectively prevent foreign nationals from indirectly laundering their political contributions through otherwise legal sources.

A group of noncitizen plaintiffs and advocacy organizations challenged Washington's law as violating their free speech guarantees under the Washington Constitution, which the State's courts have notably recognized to be "less tolerant" to government restrictions on speech than their federal counterpart. *OneAmerica Votes v. State*, 518 P.3d 230, 240 (Wash. Ct. App. 2022). The claims advanced by the plaintiffs under the Washington Constitution are virtually identical to the claims that Plaintiffs here advance under the U.S. Constitution. *See id.* at 235. The only difference is that, in the Washington case, the State had an arguably *higher* bar to clear in order to defend its law. The fact that Washington's law stands to this day reveals the scant merit underlying Plaintiffs' claims.

**II.     The Sixth Circuit's Decision in *Yost* to Stay the District Court's Preliminary Injunction Should be Treated as Dispositive.**

This court need look no further than the Sixth Circuit's recent decision in *OPAWL - Building AAPI Feminist Leadership v. Yost*, 118 F.4th 770 (6th Cir. 2024), to dispose of this motion. *Yost* arose after Ohio enacted its own law prohibiting foreign nationals—the definition of which, unlike H.B. 2106, *includes* lawful permanent residents—from making contributions or expenditures to support or oppose candidates and statewide ballot measures. The law was then challenged on largely the same First Amendment grounds that are raised here. The *Yost* plaintiffs included a political organization claiming to receive foreign funding – no different than Kansans for Constitutional Freedom – in addition to two non-citizen lawful permanent residents and a U.S. citizen who shared a joint bank account with their non-citizen spouse and feared criminal prosecution. They argued the law was unconstitutionally overbroad and facially invalid and sought a preliminary injunction, and the district court agreed.

Citing the law's inclusion of lawful permanent residents and "'those who receive money from them,'" *Yost*, at 775, the district court enjoined the State from enforcing the law against all "foreign national individuals." *Id.* at 774. Upon Ohio's request, the Sixth Circuit stayed the district court's injunction, wholly rejecting the lower court's reasoning – much of which resonates throughout plaintiffs' arguments here. In a particularly apt note for this Court, the Sixth Circuit pointed out the "substantial overlap" between the four factors governing the grant of a stay and the

9

factors governing a grant of a preliminary injunction. *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

For a law to be unconstitutionally overbroad, it must be "substantially overbroad 'relative to its plainly legitimate sweep.'" *Yost* at 775. (internal citation omitted). Plaintiffs here wildly distort the scope of H.B. 2106, insisting it would sweep in "vast amounts of protected speech of U.S. Citizens" and "force Kansans to choose between accepting financial support" or "surrendering their voice in the political process." *See* ECF 9 at 17-18. The Sixth Circuit characterized these sorts of generalized statements without actual evidence of the law's purported impact and breadth as insufficient to support an overbroad claim. *See Yost*, 118 F.4th at 775-76. The truth is that H.B. 2106 only imposes restrictions on the speech of individuals and entities with substantial financial connections to foreign influences far beyond that of ordinary Kansas citizens and businesses.

There are, of course, distinctions between H.B. 2106 and the law at issue in *Yost*, which naturally impact the scope and degree of their respective constitutional intrusions. For example, Ohio's law entirely prohibits lawful permanent residents in their state from influencing their electoral process in any way, but H.B. 2106 specifically exempts that category of individuals from such prohibitions in Kansas. *See Yost,* 118 F.4th at 773-74; 2025 Kansas Laws Ch. 27 (H.B. 2106) § 1(e)(1). In addition, the Kansas Legislature included provisions in H.B. 2106 aimed at preventing foreign actors from evading the law's prohibitions and penalties through

various loopholes, such as laundering their funds through a domestic individual or entity. *See*, *e.g.*, H.B. 2106 § 1(a)(2). Plaintiffs melodramatically claim there is no compelling governmental interest that could constitutionally justify these additional restrictions and basic record keeping requirements, the majority of which have existed at the federal level under FECA for decades. *See* ECF 9 at 17-18. But just as the Sixth Circuit concluded in *Yost*, H.B. 2106 passes constitutional muster even if strict scrutiny is applied. *See Yost*, 118 F.4th at 776-77, 785 (assuming, purely for the sake of argument, that strict scrutiny applies and finding Ohio's law satisfied it).

Both Ohio's law and H.B. 2106 were enacted to serve the same well-settled and well-pedigreed compelling interest: "preventing foreign influence over [their] elections." *Id.* at 777-78; *see also Bluman v. FEC*, 800 F. Supp. 2d 281, 287-88 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). The additional provisions in H.B. 2106 are not just rationally connected to that interest—they were specifically designed to better achieve it while minimizing the risk of inadvertently burdening the rights of everyday Kansans and domestic entities. Thus, it is wrong to contend, as plaintiffs do, that the only compelling interest available here is the prevention of *quid-pro-quo* corruption. *See* ECF 9 at 8. To paraphrase then-D.C. Circuit Court of Appeals Judge Kavanaugh in *Bluman*, H.B. 2106 "does not serve a compelling interest in limiting the participation of *nonvoters* in the activities of democratic self-government; it serves the compelling interest of limiting the participation of *non-Americans* in the activities of democratic self-government." 800 F. Supp. 2d at 290 (emphases in original) (quoted by *Yost*, 118 F. 4th at 779).

11

The only question remaining, then, is narrow tailoring. While plaintiffs hyperventilate that H.B. 2106 is "breathtakingly overinclusive," ECF 9 at 11, many of the provisions which plaintiffs attack were specifically crafted to spare ordinary people and businesses in Kansas. The receipt of over $100,000 from foreign sources over the course of an election cycle is more than enough of a financial windfall for the State of Kansas to reasonably determine that the risk of non-American influence bleeding into its electoral process is sufficiently high enough to trigger preventative measures.

### III. Kansas Has Good Reason to Believe H.B. 2106 is Necessary to Protect the Integrity of the Vote.

Finally, the Kansas statute is necessary as a matter of public policy. Foreign money is actively influencing the electoral process of the State of Kansas, and the plaintiffs in this case—Kansans for Constitutional Freedom—admit that their largest single donor, the Sixteen Thirty Fund, has ties to Swiss billionaire Hansjörg Wyss. *See, e.g.*, John Hanna, *Kansas Group Fights Campaign Donor Law It Sees as a Response to Its Success Defending Abortion*, Associated Press (May 19, 2025) https://apnews.com/article/foreign-campaign-donors-kansas-ballot-questions-b01a86fc9d5d6d568a9c60868dacc3e3. It is detrimental to democratic legitimacy and the vitality of Kansas' political community for foreign billionaires to act like oligarchs and pump millions of dollars into organizations designed to change Kansan votes. *See* Kan. Gov't Ethics Comm'n, *Receipts and Expenditures Report of a Person Promoting or Opposing a Kansas Constitutional Ballot Question* (Feb. 15, 2023),

https://www.kansas.gov/ethics/CFAScanned/ConstitutionalBallot/2022/202202/constfreedom_2302.pdf. Indeed, the nearly $1.6 million contribution Plaintiff received from the Sixteen Thirty Fund—an organization with substantial support from a foreign national—constituted its single largest donation during the contentious 2022 ballot measure debate.

Lest the court be left with the impression that this is about a single donation, much more information is publicly available. Kansans for Constitutional Freedom has received millions more in donations from groups that have received contributions from Hansjörg Wyss. *See* the Americans for Public Trust document included herein as Attachment A (showing contributions from Wyss received by ACLU Network, Planned Parenthood Network, and NARAL as shown on Kansas campaign finance reports) (available at https://americansforpublictrust.org/wp-content/uploads/2025/04/APT_Wyss-Billionaire.pdf.).

From concerns about Russian interference to successful attempts to push Kansas politics toward the policy preferences of a Swiss billionaire, foreign influence in elections and policy has a detrimental effect on political legitimacy that has been a concern for hundreds of years. Courts should be reticent to enable such caustic foreign influence lightly, especially when foreigners have been shown to have exerted influence on Kansan elections successfully.

## CONCLUSION

Maintaining public confidence in the integrity of the vote is "critical . . . to democracy." *Lee*, 915 F.3d at 1327 (internal citation omitted). Toward this end, the State of Kansas has acted to prevent foreign influence on its elections and ballot initiatives, whether directly or indirectly. H.B. 2106, as did Washington's and Ohio's laws, satisfies constitutional muster even under strict scrutiny review. These other laws have banned political contributions from lawful permanent residents; restricted the ability of foreign nationals to spend in support of ballot measures as well as candidates; and even penalized U.S. citizens and domestic entities that make prohibited contributions using funds contributed by foreign nationals or lawful permanent residents. H.B. 2106 incorporates these foundational elements and, if anything, attempts to improve the efficacy of their regulatory scheme to prevent foreign election influence. This should strengthen, not weaken, H.B. 2106's constitutional legitimacy.

Dated: June 17, 2025

Respectfully submitted,

*/s/ Bradley J. Schlozman*
Bradley J. Schlozman (Bar #17621)
**HINKLE LAW FIRM LLC**
1617 N. Waterfront Parkway, Ste. 400
Wichita, KS 67206
Tel: (316) 660-6296
E-mail: bschlozman@hinklaw.com

Jason Torchinsky (Va. Bar No. 47481)
**HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC**
15405 John Marshall Hwy.
Haymarket, VA 20169
Tel: (540) 341-8808
E-mail: jtorchinsky@holtzmanvogel.com

*Counsel for Proposed Amici Americans for Public Trust and Honest Elections Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2025, the foregoing was filed electronically with the Clerk of the Court for the United States District Court for the District of Kansas by using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Bradley J. Schlozman*
Bradley J. Schlozman
