**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

<table>
<tr><td>

**KANSANS FOR CONSTITUTIONAL**
**FREEDOM,**

                      **Plaintiff**,

**v.**

**KRIS KOBACH, et al.,**

                    **Defendants**.

</td><td>

**Case No. 25-2265-DDC-GEB**

</td></tr>
</table>

## <u>MEMORANDUM AND ORDER</u>

The Kansas Legislature recently decided to limit foreign influence in Kansas constitutional amendment ballot issues. To that end, it passed House Bill 2106 in the spring of 2025. And this provision became law when Kansas's Governor neither vetoed nor signed the bill within the specified period.

Plaintiff Kansans for Constitutional Freedom (KCF) takes issue with this bill. It contends that the Legislature overstepped its bounds. KCF asserts that HB 2106 violates protected First Amendment freedoms and Fourteenth Amendment Due Process rights. KCF thus brings facial and as-applied challenges against defendants Kris Kobach, in his official capacity as Attorney General of Kansas, and against the Chairman, Executive Director, and other members of the Kansas Governmental Ethics Commission (KGEC), in their official capacities. KGEC implements and enforces the Kansas Campaign Finance Act, of which HB 2106 is a part. KCF asks the court to enjoin preliminarily any efforts by defendants to implement or enforce HB 2106 before it takes effect on July 1, 2025.

The court held a preliminary injunction hearing on June 23, 2025. Having considered the parties' briefs and oral arguments, the court denies KCF's motion. It concludes that HB 2106 likely survives strict scrutiny and passes constitutional muster. The court also decides that HB 2106 likely isn't unconstitutionally invalid for lacking a *mens rea* requirement, or on overbreadth or vagueness theories. Finally, the parties now appear to agree that HB 2106 only applies prospectively—not retrospectively—permitting the court to defer any injunctive relief based on this concern, at least for now. These conclusions suggest KCF isn't likely to succeed on the merits of its claims and so, the court denies preliminary relief. The court explains these conclusions, below, beginning with the relevant background.

## I.    Factual Background

KCF is a bipartisan coalition of reproductive rights advocates and allied organizations. Doc. 1 at 9 (Compl. ¶ 22). Formed in 2021, KCF served as the primary organization opposing a 2022 proposed amendment to the Kansas Constitution—a measure that sought to eliminate the constitutional right to an abortion in Kansas. *Id.* To that end, KCF spent more than $11 million dollars opposing the 2022 amendment. *Id.* (Compl. ¶ 23). It focused its efforts primarily on individual conversations with Kansas voters. *Id.* at 16 (Compl. ¶ 59).

KCF intends to utilize its existing resources and solicit future contributions to support or oppose other amendments to the Kansas Constitution. *Id.* at 9 (Compl. ¶ 24). Most imminently, KCF plans to mount a similar effort opposing the proposed constitutional amendment changing the way Kansas selects members of its Supreme Court, Senate Concurrent Resolution 1611. *Id.* at 16 (Compl. ¶ 62). KCF alleges it already has secured funding commitments to oppose SCR 1611. *Id.* at 17 (Compl. ¶ 68). But to succeed in its efforts, KCF alleges it must start months ahead of an election to book advertising time, identify and work with vendors, and develop and

implement a voter turnout strategy.  *Id.* (Compl. ¶ 69).  KCF contends newly adopted HB 2106 precludes its ability to proceed.  *Id.* at 24–25 (Compl. ¶ 95).

HB 2106 amends Kan. Stat. Ann. § 25-4180 of the Kansas Campaign Finance Act.[1]  Doc. 1-1 at 2–3 (Pl. Ex. A).  It adds a new prohibition against accepting foreign funds—or funds from donors who accept foreign funds—when engaging in activities promoting or opposing a Kansas constitutional amendment.  Doc. 1-1 at 2 (Pl. Ex. A); § 25-4180(a)–(e).  KCF contends the changes implemented by HB 2106 "ultimately operate[] as a complete ban on speech about constitutional amendments in Kansas for certain disfavored speakers."  Doc. 1 at 18 (Compl. ¶ 73).  More than that, though KCF asserts that HB 2106 "is a direct response to KCF's 2022 advocacy efforts."  Doc. 9 at 8.  KCF explains that HB 2106's proponents "explicitly singled out KCF's success in advocating against the 2022 amendment as justification for HB 2106's new prohibitions" against foreign-backed funds.  Doc. 1 at 18 (Compl. ¶ 72).  In short, KCF argues that Kansas Legislators targeted KCF when they drafted HB 2106—with the intent of silencing its speech—thus violating the First Amendment.  Doc. 9 at 7.

The Kansas Senate Federal and State Affairs Committee conducted hearings on HB 2106 on February 26, 2025.  *See* Doc. 9-3 at 2 (Pl. Ex. B); Doc. 9-4 at 2 (Pl. Ex. C).  In the hearings, two proponents of HB 2106—and amici in this case—identified KCF as the recipient of nearly $1.6 million in foreign-tied funds in 2022.  Doc. 9-3 at 4 (Pl. Ex. B); Doc. 9-4 at 2 (Pl. Ex. C).  KCF used those funds to support its 2022 opposition to Kansas's proposed abortion amendment.  Doc. 9-3 at 4 (Pl. Ex. B); Doc. 9-4 at 2 (Pl. Ex. C).  Those foreign-backed funds, proponents testified, came from the Sixteen Thirty Fund—a Washington D.C.-based group purportedly supported by Swiss billionaire Hansjörg Wyss.  Doc. 9-3 at 3–4 (Pl. Ex. B); Doc. 9-4 at 2 (Pl. Ex.

---

[1]    All citations to Kan. Stat. Ann. § 25-4180 refer to the text of that section as amended by HB 2106.

C).  According to proponent testimony, Wyss has contributed generously to the Sixteen Thirty Fund—to the tune of some $280 million over several years.  Doc. 9-3 at 3 (Pl. Ex. B)

KCF filed this action against defendants Kris Kobach—in his official capacity as Attorney General of Kansas—and the members, chairman, and executive director of the Kansas Governmental Ethics Commission (KGEC), in their official capacities.  Doc. 1 at 2.  KGEC enforces HB 2106's prohibition against accepting funds from foreign nationals.  *Id.* at 10 (Compl. ¶ 26) (citing Kan. Stat. Ann. § 25-4180(d)(3)).  KCF alleges HB 2106 violates the First and Fourteenth Amendments to the U.S. Constitution.  *See id.* at 6, 7 (Compl. ¶¶ 9, 14).  KCF asserts both facial and as-applied challenges to HB 2106's constitutionality.  Doc. 9 at 24.  KCF thus asks the court to issue a preliminary injunction, enjoining defendants "from taking any steps to implement and enforce HB 2106."  Doc. 1 at 51 (Compl. "Wherefore" B); *see also* Doc. 9. The bill takes effect July 1, 2025.  Doc. 1 at 3 (Compl. ¶ 2).

Given the issues presented here, the court includes a more detailed overview of the statute at issue—as amended—before taking up the legal standard and analysis necessary to decide KCF's motion.  The court also attaches, as an appendix, the full text of the statute.  What follows is a brief primer on HB 2106.

## II.    HB 2106

The Legislature engrafted HB 2106 into an already extant statutory provision of the Kansas Campaign Finance Act.  This provision—Kan. Stat. Ann. § 25-4180—imposes reporting requirements on any person engaging in actions promoting or opposing a change to the Kansas constitution.  Central to HB 2106 is a new prohibition that limits the influence of foreign money on ballot amendment votes.  HB 2106 makes it unlawful to accept a contribution or expenditure from a "foreign national"—a term defined by the bill—to support any activities promoting or

4

opposing an amendment to Kansas's constitution.  Kan. Stat. Ann. § 25-4180(d)(1).  And it provides that the attorney general "may prosecute" anyone who does so.  § 25-4180(d)(2).  The attorney general or KGEC may bring a civil action, as well.  § 25-4180(d)(3).  This section of the statute expressly specifies that the now-taboo contributions/expenditures are those "made for any activity promoting or opposing" a constitutional amendment.  § 25-4180(d)(1).

HB 2106 also mandates reporting and certification requirements.  The statute requires a report from every person who engages in any constitutional amendment-focused activity— whether promoting or opposing it—and who accepts money or property to do so.  § 25-4180(a). Certifications must accompany those reports.  The certifications function on two levels.

*First*, the person engaging in the activity must certify that the person hasn't accepted knowingly contributions or expenditures—directly or indirectly—from a foreign national.  § 25-4180(a)(1).  This subsection doesn't specify any look-back period for this form of money accepted.  Nor does it specify any monetary minimum or identify the contribution or expenditure's purpose.

*Second*, the engaged person also must certify that no listed donor knowingly accepted contributions or expenditures exceeding $100,000—directly or indirectly—from any foreign national "within the four-year period immediately preceding" the contribution or expenditure date.  § 25-4180(a)(2).  And the person must certify that no listed donor is a foreign national.  *Id.* To accomplish this second-level certification, HB 2106 requires that the person accepting contributions of this type must require each of the person's donors to certify these things, as well. § 25-4180(b).

Such certifications also follow when a person makes an independent expenditure for any activity promoting or opposing a Kansas constitutional amendment.  Kan. Stat. Ann. § 25-

4180(c).  The expending person must certify that the expending person hasn't accepted any money, directly or indirectly, from a foreign national that, in the aggregate, exceeds $100,000 within the four-year period before the date of the expenditure.  *Id.*  The person must also certify that the certifier won't accept any such money for the rest of the calendar year.  *Id.*

Beyond certifications, HB 2106 defines a foreign national.  This defined term includes not only a foreign government or political party, but also any foreign entity, any U.S. entity that is majority owned by any foreign national, and any individual who is not a citizen or lawful permanent resident of the United States.  § 25-4180(e).

With that brief overview of the pertinent statutory scheme, the court recites the governing legal standard and then, provides its analysis of KCF's arguments.

## III.    Preliminary Injunction Legal Standard

As our Circuit has explained time and again, a preliminary injunction "is an extraordinary remedy, the exception rather than the rule."  *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation cleaned up).  To succeed on such a motion, the moving party must establish four things:  "(1) that [it's] 'substantially likely to succeed on the merits,' (2) that [it'll] 'suffer irreparable injury' if the court denies the injunction, (3) that [its] 'threatened injury' (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't 'adverse to the public interest.'"  *Id.* (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)).  The third and fourth factors "merge" when, as here, the government is the party opposing injunctive relief.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A plaintiff seeking preliminary relief must make a "clear and unequivocal showing" on all four requirements.  *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (quotation cleaned

up). But "in First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (internal quotation marks and citation omitted). When "the failure to satisfy one factor is dispositive, a court need not consider the other factors" for preliminary relief. *Colorado*, 989 F.3d at 890 (declining to consider the remaining factors where plaintiffs failed to show irreparable harm).

As *Hobby Lobby*'s general rule predicted, KCF's right to preliminary relief turns on its likelihood of success on the merits. The court thus starts—and ends—its analysis with that first factor. Because KCF hasn't made a "clear and unequivocal" showing that it is likely to succeed on the merits of its claims, *Colorado*, 989 F.3d at 883, the court needn't reach the other three factors.

## IV.    Likely to Succeed on the Merits

KCF attacks HB 2106 on multiple fronts. *First*, it contends the plain text of the statute silences KCF's (and other U.S. speakers') ballot-issue-related speech. Doc. 9 at 7, 12–20. *Second*, it argues that HB 2106 severely burdens KCF's associational rights. *Id. Third*, KCF asserts that HB 2106 violates the First Amendment by imposing liability for speech without a *mens rea* requirement. *Id.* at 21–22. *Fourth*, it contends HB 2106 is unconstitutionally overbroad and vague. *Id.* at 7, 22–28. *Finally*, KCF argues HB 2106 violates due process. *Id.* at 28–30. The court takes up each theory of unconstitutionality—combining the first two—to evaluate KCF's likelihood of success on the merits. Start with freedoms of speech and association.

### A.  First Amendment Violations:  Freedoms of Speech and Association

KCF contends HB 2106 operates as a direct prohibition on speech, barring those who have accepted funds from foreign nationals from promoting or opposing Kansas constitutional amendments.  Doc. 9 at 12.  KCF explains that it can't make the certifications HB 2106 requires because it has accepted contributions from donors who accepted money from foreign nationals within the last four years.  *Id.* at 10; *see also* Doc. 9-3 at 3–4 (Pl. Ex. B); Doc. 9-4 at 2 (Pl. Ex. C).  Because KCF can't make those certifications, HB 2106 effectively silences its future speech on Senate Concurrent Resolution 1611—the pending proposal to amend the Kansas constitution's method for selecting Kansas Supreme Court members.  Doc. 9 at 10.

Defendants mitigated some of KCF's concerns at the preliminary injunction hearing. There, defendants clarified that any funds accepted before the statute's effective date—July 1, 2025—wouldn't fall within the ambit of the amended statute.  *See* Doc. 36 at 24, 38 (Hr'g Tr. 24:18–23; 38:17–21).  Defendants also had asserted as much in their response to KCF's motion, explaining:  "A person like Plaintiff who solicited moneys from foreign nationals to advocate for past constitutional amendments is not prohibited from advocating for future amendments because of those past receipts.  Plaintiff would only violate the Act to the extent it accepts foreign moneys for future constitutional advocacy."  Doc. 27 at 22.  This clarity on the amended law's retroactive potential apparently alleviated KCF's most pressing concern—that lawful actions it took in the past bar its future speech.  The court addresses the retroactivity question more fully, below.  *See* § IV.D.  KCF nonetheless remains concerned about the burdens HB 2106 places on its speech prospectively.

KCF also contends that HB 2106 functions as "a content-based restriction on political speech[.]"  Doc. 32 at 9.  What's more, many other organizations—similar to KCF—likely can't convince donors to provide the assurances HB 2106 demands, thus quashing their speech as well.

Doc. 9 at 12.  In addition, KCF contends that HB 2106 restricts what U.S. citizens may hear, a right that, in KCF's view, the First Amendment also protects.  *Id.* at 16.  Finally, KCF argues that HB 2106 infringes on its First Amendment associational rights.  *Id.* at 13.  It argues HB 2106 "broadly prohibits KCF from freely associating with noncitizens through its certification requirements . . . its imposition of criminal and civil liability on persons who accept funds from foreign nationals, and the threat of investigation."  *Id.*

### 1.    Strict Scrutiny

Given these restrictions on speech and association, KCF asserts that the court must evaluate HB 2106 under a strict scrutiny standard of review.  Doc. 9 at 12–13.  Here's how KCF reaches that conclusion:  Burdens on political speech implicate strict scrutiny.  *Grant v. Meyer*, 828 F.2d 1446, 1452 (10th Cir. 1987) ("[R]estraints on political association and communication, imposed by restrictions on financing of campaigns for ballot measures, are suspect and subject to strict scrutiny."), *aff'd*, 486 U.S. 414 (1988).  The same goes for laws that distinguish speech based on content.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Content-based laws— those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").  HB 2106 only restricts speech that promotes or opposes Kansas constitutional amendments—a restriction that is plainly content-based.  *See Holland v. Williams*, 457 F. Supp. 3d 979, 989 (D. Colo. 2018) ("[T]he enforcement provisions concern enforcement of campaign and political finance and campaign practice law, nothing else.  Under *Reed*, this is all that is required for the enforcement provisions to be considered content-based.").  Burdens on associational rights implicate strict scrutiny, as well.  *NAACP v. Alabama*, 357 U.S. 449, 460–61

(1958).  The grand conclusion, KCF argues, is that the court must apply strict scrutiny.  Doc. 9 at

12–14.

In their briefing, defendants never object to a strict scrutiny analysis.  Doc. 27 at 16–18.

And at the hearing, defendants conceded that, for purposes of the preliminary injunction, the

court can apply strict scrutiny.  Doc. 36 at 17 (Hr'g Tr. 17:13–25).  And so, the court does.[2]

KCF contends HB 2106 can't survive strict scrutiny because it neither serves a

compelling state interest nor is it narrowly tailored.  Doc. 9 at 14–20.  Predictably, defendants

disagree, and on both fronts.  Doc. 27 at 16–18.

---

[2]    The court finds a certain muddiness to the level of scrutiny question.  The Supreme Court has
distinguished between regulating *expenditures* and regulating *contributions*.  And the Court applies a
different standard of review to each:  "[R]estrictions on political contributions have been treated as
merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment,
because contributions lie closer to the edges than to the core of political expression."  *Fed. Election
Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003).  So, courts review regulation of contributions and
disclosure regimes under exacting scrutiny.  *See Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1244 (10th Cir.
2023).

Under exacting scrutiny, the government "must demonstrate a substantial relation between a
disclosure scheme's burden and an important governmental interest."  *Id.*  The government must also
"show that the regime is narrowly tailored to the government's asserted interest[,]" thereby requiring the
court to consider "'the extent to which the burdens are unnecessary.'"  *Id.* (quoting *Ams. for Prosperity
Found. v. Bonta*, 594 U.S. 595, 611 (2021)).  But "the Supreme Court treats expenditure limitations
differently because they necessarily reduce the quantity of expression by restricting the number of issues
discussed, the depth of their exploration, and the size of the audience reached."  *Wyo. Gun Owners*, 83
F.4th at 1243 (quotation cleaned up).  "Because expenditure restrictions limit core political speech, they
must satisfy strict scrutiny—a provision must be narrowly tailored to further a compelling governmental
interest."  *Id.* (quotation cleaned up).

Here, HB 2106 implicates both expenditures and contributions, leaving the strict versus exacting
scrutiny question a more puzzling one.  Many courts dealing with similar statutory schemes avoid the
scrutiny decision altogether by asserting that the same result would apply under either scrutiny level.  *See
OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 118 F.4th 770, 777 (6th Cir. 2024) ("[W]e decline to
resolve what tier of scrutiny applies, because § 121 passes muster even under the regular forms of
scrutiny for campaign finance regulations."); *Minn. Chamber of Com. v. Choi*, 707 F. Supp. 3d 846, 859
(D. Minn. 2023) ("But it makes no difference in the end. . . . [T]he political contribution prohibitions in §
211B.15 would fail even under the 'closely drawn' test for the same reasons the challenged provisions are
not narrowly tailored." (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 199 (2014))).
That's likely true here, as well.  In any event, the parties agree that the court should apply strict scrutiny
during this stage of the proceedings, and the court does so.

### a.    Compelling State Interest

The compelling interest analysis is straightforward.  A state may limit the participation of foreign citizens in activities of American democratic self-government.  Indeed, the Supreme Court summarily has affirmed a similar compelling interest for the federal government.  *See Bluman v. FEC*, 565 U.S. 1104 (2012).  So, unless some distinguishing factor precludes application of binding precedent—it doesn't—HB 2106 serves a compelling state interest.

In *Bluman v. FEC*, a three-judge panel of the United States District Court for the District of Columbia held that "the United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over U.S. political processes."  800 F. Supp. 2d 281, 288 (D.D.C. 2011) (Kavanaugh, J.).  The Supreme Court summarily affirmed the district court panel.  565 U.S. 1104.  *Bluman* means that KCF must demonstrate that the present case meaningfully differs to escape *Bluman*'s binding holding.  *See United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020) (agreeing with district court that Ninth Circuit is "bound by the Supreme Court's summary affirmance in *Bluman*" because "summary affirmances bind lower courts" to the extent of "the precise issues presented and necessarily decided by those actions").  Otherwise, *Bluman*'s conclusion that the government has a compelling interest "in limiting the participation of foreign citizens in activities of American democratic self-government" must govern this court's compelling interest analysis.  Two factors potentially distinguish between *Bluman* and this case:  *Bluman* addressed federal, not state, interests and it concerned candidate-related political spending, not ballot-issue-related political spending.  The court addresses each factor, in turn, below.

*First*, *Bluman* addressed a *federal* interest in limiting foreign influence:  "It is fundamental to the definition of our *national* political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government.  It follows that the *United States* has a compelling interest . . . in limiting the activities of foreign citizens[.]"  800 F. Supp. 2d at 288 (emphasis added).  But KCF never argues that this state/federal distinction makes a meaningful difference in the compelling interest analysis.  *See generally* Doc. 9; Doc. 32.  And with good reason.  The animating principles behind the federal government's compelling interest apply with equal force to the states.  Indeed, *Bluman* establishes this compelling interest, in part, by citing cases where *state statutes* denied foreign citizens certain rights and privileges.  *See* 800 F. Supp. 2d at 287–88 (first citing *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) (upholding California statute); then citing *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding New York statute); and then citing *Foley v. Connelie*, 435 U.S. 291 (1978) (upholding New York statute) (subsequent citations omitted)).  So, *Bluman*'s foundational groundwork concluding the federal government has a compelling interest assumed a similar interest for the states.  Thus, the first potentially distinguishing factor between *Bluman* and this case is overcome easily.  *See also OPAWL - Bldg. AAPI Feminist Leadership v. Yost*, 747 F. Supp. 3d 1065, 1083 (S.D. Ohio 2024) ("States' interest in defining their political community is equivalent to the Federal Government's interest in defining the national political community."); *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 721 F. Supp. 3d 31, 48 (D. Me. 2024) ("The State, however, has an equally strong interest [as the federal government] in regulating its own state and local elections.").  On next to KCF's other possible exit ramp.

*Second*, *Bluman* didn't determine the government's compelling interest in the context of ballot issues. *Bluman* held that *candidate-related* political spending implicated the government's compelling interest—not *issue-related* spending. 800 F. Supp. 2d at 292. Indeed, *Bluman* explicitly clarifies that its holding "does not address" questions about "issue advocacy and speaking out on issues of public policy" and that its "holding should not be read to support [issue advocacy] bans" on foreign spending. *Id.* KCF argues that this distinction matters here. *See* Doc. 9 at 14–15. Defendants say it doesn't. Doc. 27 at 18.

KCF distinguishes a government's interest in restricting political speech in the candidate context from the ballot-issue contexts. It highlights how the Supreme Court has differentiated candidate elections from ballot measures. Doc. 9 at 14 (first citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978); and then citing *Citizens Against Rent Control / Coal. for Fair Hous. v. City of Berkley*, 454 U.S. 290, 299 (1981) ("[T]here is no significant state or public interest in curtailing debate and discussion of a ballot measure.")). KCF contends that issue advocacy—which implicates ideas—needn't be free of foreign influence because voters should be free to get information from diverse sources. Doc. 9 at 15–16. It argues that Kansas's attempts to restrict foreign influence here thus represent a "'paternalistic approach of statutes. . . which restrict what the people may hear.'" *Id.* (quoting *Bellotti*, 435 U.S. at 791 n.31).

Defendant counters, asserting that political spending on ballot issues is even "closer to democratic self-government" than spending on political candidates. Doc. 27 at 18. That's so, they say, because constitutional amendment ballot measures "influence Kansans' decisions on changes to their 'fundamental law.'" *Id.* Defendants thus argue that *Bluman*'s compelling interest applies with equal force—or even greater force—to ballot issues. *Id.* Defendants have

13

the better end of this argument.  After all, ballot issues implicate democratic self-government even more directly than candidate advocacy.  *See OPAWL*, 747 F. Supp. 3d at 1084 ("Ballot initiatives are perhaps the purest, most democratic 'process of . . . self-government.'  Ballot initiatives are more directly democratic than candidate elections, in that the people make law for themselves, instead of their elected representatives making it for them.").  And the ballot issues at stake here, state constitutional amendments, shape the state's most foundational document.

True, one could decry Kansas's approach in HB 2106 as an unnecessary and paternalistic limit on which ideas get to compete in the marketplace of ideas.  Perhaps it'd be better, as KCF suggests, to allow Kansas voters to hear different perspectives—from many diverse sources—and trust the voters to make a choice for themselves.  *See Bellotti*, 435 U.S. at 791–92 ("[T]he people in our democracy are entrusted with the responsibility of judging and evaluating the relative merits of conflicting arguments.  They may consider, in making their judgment, the source and credibility of the advocate.").  But the governing law recognizes a compelling government interest "in limiting the participation of foreign citizens in activities of American democratic self-government[.]"  *Bluman*, 800 F. Supp. 2d at 288.  So—whether wise or unwise policy—the prevailing law recognizes Kansas's compelling interest in limiting foreign influence when it comes to decisions about their "fundamental law."  Doc. 27 at 18.

Bolstering this conclusion are decisions by other courts.  They have addressed similar state attempts to limit foreign spending on ballot measures and likewise found a compelling state interest.  *See, e.g.*, *OPAWL*, 118 F.4th at 777–78 ("[E]xcluding non-citizens from certain activities can advance a compelling interest when those activities form part of 'the process of democratic self-government.'  Campaign contributions and independent expenditures are part of our process of democratic self-government." (quoting *Bluman*, 800 F. Supp. 2d at 287)); *Minn.*

*Chamber of Com.*, 707 F. Supp. 3d at 854 (noting challenged provisions include ballot questions and concluding that "[p]reventing foreign influence on Minnesota elections is a compelling state interest").

In sum, the court thus concludes that Kansas likely has a compelling interest in restricting foreign influence on constitutional amendment ballot activities.

### b.    Narrowly Tailored

Now the second portion of the strict scrutiny analysis:  Kansas must have narrowly tailored HB 2106 for the statute to survive.  "[I]f a law targets protected speech in a content-based manner, it is 'presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests.'"  *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1227 (10th Cir. 2021) (second brackets in original) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018)).  "Under strict scrutiny, the government must adopt the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quotation cleaned up).  "The heavy burden of demonstrating that a content-based restriction is the least restrictive means among available, effective alternatives lies with the government."  *Peck v. McCann*, 43 F.4th 1116, 1135 (10th Cir. 2022) (internal quotation marks and citation omitted).  When a state's legitimate ends "affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011).

KCF contends that HB 2106 doesn't use the least restrictive means of accomplishing Kansas's compelling state interest because the bill's means are both overinclusive and underinclusive.  Doc. 9 at 16–20.  Defendants' brief offered no substantive response, making just

two conclusory statements about tailoring.  Doc. 27 at 16 ("HB 2106 . . . is tailored to those

interests"); *id.* at 18 ("The statute is—and through the administrative process will continue to

be—tailored to this interest.").  But defendants met this challenge at the preliminary injunction

hearing, presenting a full-throttled, narrow tailoring argument.  Start with overinclusivity.

### i.    Overinclusive

"A statute may fail narrow tailoring for being overinclusive—that is, infringing on more

First Amendment rights than is necessary to advance the compelling interest."  *OPAWL*, 747 F.

Supp. 3d at 1088.  KCF identifies three qualities of HB 2106 it deems overinclusive.  *First*, § 25-

4180(a)(1) doesn't specify a monetary minimum.  Doc. 9 at 17.  Thus, receipt of even one dollar

from a foreign national, KCF alleges, precludes a person's ability to make the requisite

certification.  *Id.  Second*, under the plain text of several of the statute's provisions—§§ 25-

4180(a)(1), (2), 25-4180(b), 25-4180(c)—the foreign national could have made the damning

contribution or expenditure for *any purpose*—and not just constitutional amendment advocacy.

*Id.* at 17–18.  According to KCF, this proves problematic for "innumerable civil society

organizations," including "churches, veterans' groups, labor unions, homeowners' associations,

or organizations like the ACLU[.]"  *Id.* at 18.  *Third*, KCF contends the dual-tiered certification

requirement—applying to both the expending organization and its donors—also is overinclusive.

*Id.*

Defendants met those arguments during the hearing, arguing that HB 2106 is narrowly

tailored and "exceedingly cautious."  Doc. 36 at 31, 32 (Hr'g Tr. 31:22–24; 32:9).  *First*,

defendants argued, it bars only contributions and expenditures made for the specific purpose of

promoting or opposing a Kansas constitutional amendment.  *Id.* at 27–29 (Hr'g Tr. 27:24–29:14).

*Second*, defendants argued that the law only bars contributions and expenditures from foreign

nationals. *Id.* at 31–32 (Hr'g Tr. 31:7–12; 31:25–32:2) ("First [HB 2106] bars only contributions and expenditures from foreign nationals. As I've said, made for that specific purpose. That's a lot of narrow tailoring work."). And, defense counsel noted, the definition of foreign national likewise demonstrates restraint. *Id.* at 32 (Hr'g Tr. 32:3–18). It excludes lawful permanent residents, *see* § 25-4180(e)(1), which the Ohio statute at issue in *OPAWL* includes. *Id.* at 32 (Hr'g Tr. 32:3–7); *see OPAWL*, 118 F.4th at 780. HB 2106's foreign national definition also excludes United States entities unless they are wholly or majority-owned by a foreign national. Doc. 36 at 32 (Hr'g Tr. 32:8–16); *see also* § 25-4180(e)(5). And even then, defendants asserted, the statute provides a way for wholly or majority foreign-owned United States entities to contribute or expend on Kansas constitutional ballot measures—within certain confines ensuring funds from domestic operations or decision-making by United States citizens or lawful permanent residents. Doc. 36 at 32 (Hr'g Tr. 32:8–16). *Finally*, defendants compared the Kansas HB 2106 provisions to somewhat similar statutes currently enjoined in Maine and Minnesota and one statute still on the books in Washington. *Id.* at 33–35 (Hr'g Tr. 33:6–35:1). In comparison to the Maine and Minnesota statutes, defendants contended, HB 2106 permits a significant level of foreign ownership before U.S. entities become foreign nationals. *Id.* at 32–35 (Hr'g Tr. 32:8–35:1). And, in comparison to the Washington statute, HB 2106 still allows *some* involvement of donors with *some* foreign funding—capping it at $100,000 over four years. *Id.* at 33–34 (33:18–34:19); *see also, e.g.*, § 25-4180(a)(2). So, defendants argue, HB 2106 is just right.

Returning to KCF's overinclusive arguments, recall that KCF argued, *first*, that restricting receipt of even one dollar of foreign national funds by a reporting entity and, *third*, that requiring a dual-tiered certification system, landed HB 2106 in the overinclusive category.

The court isn't convinced. Here's why. In the narrow tailoring context, "fit matters."
*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014). That is, if a statute "is poorly
tailored to the Government's interest . . . it impermissibly restricts participation in the political
process." *Id.* On the other hand, if the "Government's chosen restriction on the speech at issue
[is] actually necessary to achieve its interest[,]" then it satisfies the requisite narrow tailoring.
*United States v. Alvarez*, 567 U.S. 709, 725 (2012) (internal quotation marks and citation
omitted). In short, there "must be a direct causal link between the restriction imposed and the
injury to be prevented." *Id.*

    Here, restricting contributions from foreign nationals and requiring dual-certification both
link—causally and directly—to the purported harm HB 2106 aims to prevent. The bill seeks to
redress foreign influence over Kansas ballot measures. Take restricting contributions from
foreign nationals, for example. If defendants want *zero* foreign influence on Kansas
constitutional amendment ballot questions—an outcome deemed permissible by the Supreme
Court—the least restrictive means accomplishing that outcome arguably requires a *zero*-dollar
policy. Thus, the absence of a monetary minimum in § 25-4180(a)(1) comports with a *zero*
foreign-influence goal, even if that means reporting entities can't receive a single dollar from
foreign nationals. The zero-dollar stricture of § 25-4180(a)(1) thus appears "actually necessary"
to achieve the state's interest here. *Alvarez*, 567 U.S. at 725 (citation omitted). And, as
defendants correctly argue, Kansas carefully limited the definition of those persons (and entities)
swept into the foreign national category. Doc. 36 at 32 (Hr'g Tr. 32:3–18). Thus, although HB
2106 tolerates *zero* dollars from foreign nationals, it narrows that restriction by its "exceedingly
cautious" definition of foreign nationals. *Id.* (Hr'g Tr. 32:9).

Similarly, Kansas's interest in preventing foreign influence makes the dual-tiered certification system "actually necessary." *Alvarez*, 567 U.S. at 725 (citation omitted). After all, even KCF's exhibits suggest that it received a not insignificant amount of foreign-backed funds to oppose Kansas's 2022 abortion amendment. *See* Doc. 9-3 (Pl. Ex. B); Doc. 9-4 (Pl. Ex. C). But those funds didn't come directly from a foreign national—they were one-step removed. That is, KCF received funds from another entity—the Sixteen Thirty Fund—which received funds from Swiss billionaire Wyss. Doc. 9-3 at 3–4 (Pl. Ex. B); Doc. 9-4 at 2 (Pl. Ex. C). The dual-certification system aims to reign-in precisely that one-step-removed foreign influence. Again, one could question whether such foreign influence—particularly in the realm of ideas—presents the danger Kansas perceives. But that's not an issue for a federal court using federal judicial power to decide. Instead, in the court's view, the correct question asks: Is the dual-tiered certification system directly and causally linked to the purported injury of foreign influence in Kansas constitutional amendment advocacy? It is. And, as defendants pointed out, HB 2106 allows some leeway. For instance, it tolerates U.S. entities—even ones *with* majority foreign ownership—to contribute or expend, within certain confines. Doc. 36 at 32 (Hr'g Tr. 32: 8–16); *see also* § 25-4180(e)(5).

The court thus concludes KCF's first and third overinclusivity arguments likely don't disrupt defendants' narrow-tailoring assertions. Instead, restricting foreign nationals' contributions and implementing a dual-tiered certification system—both under a cautiously narrow definition of foreign nationals—appear—at this preliminary stage—"actually necessary" to achieve Kansas's compelling state interest. *Alvarez*, 567 U.S. at 725 (citation omitted).

These conclusions leave KCF's second overinclusivity challenge: the statute doesn't attach a purpose statement to the restricted contributions or expenditures consistently,

conceivably sweeping in funds received for *any* purpose at all.  Doc. 9 at 17–28.  Defendants argue just the opposite.  They argued (at the hearing) that HB 2106 only bars contributions and expenditures from foreign sources made for a specific purpose.  Doc. 36 at 27–29 (Hr'g Tr. 27:24–29:14); *id.* at 31–32 (Hr'g Tr. 31:7–12; 31:25–32:2).

The statute spells out that specific purpose in Kan. Stat. Ann. § 25-4180(a).  Section (a) specifies that the "moneys or property" that constitute contributions are "for the purpose of engaging in" "any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas."  § 25-4180(a).  The statute doesn't include that purpose language, however, in § 25-4180(a)(1), (2), § 25-4180(b), or § 25-4180(c).  So, KCF contends, the restricted contributions or expenditures could advance "any purpose, not just . . . constitutional advocacy," making the reach of the statute's net just too wide.  Doc. 9 at 18.

But it "'is a fundamental canon of statutory construction that the words of a statute must be read in their *context* and with a view to their place in the overall statutory scheme.'"  *United States v. Burkholder*, 816 F.3d 607, 615 n.6 (10th Cir. 2016) (emphasis in original) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also State v. Strong*, 527 P.3d 548, 555 (Kan. 2023) ("[C]ourts should consider not only the [statute's] words themselves but also their context to bring various provisions of an act into workable harmony, if possible.").  Here, the opening paragraph of the pertinent statute explicitly ties "contributions" and "expenditures" to "any activity promoting or opposing the adoption or repeal of any provision of the constitution of the state of Kansas."  § 25-4180(a).  And that opening paragraph changed but slightly under HB 2106's amendments.  So, when the Legislature adopted HB 2106, it did so on the chassis of an already operative statutory provision that had been in place—according to

defendants' counsel at the hearing—since at least 1987.  Doc. 36 at 27 (Hr'g Tr. 27:24–25).  The Kansas Legislature decided to slide its amendments into that already operative provision, with its long history of reporting requirements for constitutional amendment advocacy activities.  Thus, if a statute ever warranted a consideration of context—it's HB 2106.  The Legislature (logically, in the court's perspective) subjugated these new provisions under those long-established contribution and expenditure requirements.  The court mustn't ignore that already operative context.  And when it accounts for that context, KCF's overinclusivity concerns grow dim.  In short, the statute's context—namely the specific purpose provided in already extant section (a)— limits the contributions and expenditures addressed by HB 2106.  The court isn't convinced that HB 2106 can apply to contributions and expenditures for just *any* purpose—kneecapping KCF's final overinclusivity argument.

At bottom, the court concludes at this preliminary stage that HB 2106 likely passes constitutional muster on the overinclusive prong.  Kansas has identified a compelling interest in preventing foreign influence in Kansans' decisions about its foundational governing document. And HB 2106—read in context of the statute's entirety—appears, on the arguments before the court at this stage, narrowly tailored to serve that interest.  KCF still can speak about constitutional amendment issues.  It just can't use foreign money to do so.  And that's a restriction—wise or not—that Kansas gets to make under the governing law.

## ii.    Underinclusive

A second means to undermine narrow tailoring is by showing underinclusiveness. "[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than favoring a particular speaker or viewpoint.'"  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (quoting *Brown*, 564 U.S. at 802).  And

"[u]nderinclusiveness can also reveal that a law does not actually advance a compelling interest." *Id.* at 449. That's so because a "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172 (citation omitted). But underinclusivity—even when it exists—isn't necessarily fatal.

"Although a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding underinclusiveness limitation." *Williams-Yulee*, 575 U.S. at 449 (internal quotation marks and citation omitted). Thus a "State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Id.* As a consequence, the Supreme Court has "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Id.*

KCF argues that HB 2106's most glaring underinclusive feature is that "it does not explicitly prohibit *foreign nationals themselves* from engaging in their own, direct spending to support or oppose a constitutional amendment." Doc. 9 at 19 (emphasis in original). Also, KCF argues, "Kansas law contains no provision prohibiting foreign nationals from lobbying Kansas *legislators*" despite HB 2106's concerns about "influencing Kansas *voters*[.]" *Id.* (emphasis in original). These points are forceful. But still, HB 2106 nonetheless presents no fatal underinclusivity concerns.

The bill's structure—specifically its dual-tiered certification provision in § 25-4180(a)(2) & (b)—suggests the Legislature's most pressing concern was back-door foreign funding. It had seen such back-door funding in the 2022 amendment advocacy cycle. *See* Doc. 9-3 (Pl. Ex. B); Doc. 9-4 (Pl. Ex. C). KCF itself acknowledges this as a driving concern behind HB 2106: "Proponents of HB 2106 explicitly singled out KCF's success in advocating against the 2022

Amendment as justification for HB 2106's new prohibitions, claiming that the amendment was defeated due to 'foreign-backed funds' contributed to KCF." Doc. 1 at 18 (Compl. ¶ 72). It thus appears that the Legislature specifically aimed to restrict organizations' ability to accept contributions from groups who receive foreign-tied funds. That is, HB 2106 addressed one aspect of a perceived problem—foreign influence—by focusing on back-door foreign funding. But it didn't address—and needn't have—"all aspects of [this] problem in one fell swoop." *Williams-Yulee*, 575 U.S. at 449. Instead, the Legislature left more overt, direct advocacy by foreign nationals—such as directly lobbying legislators—unaddressed. This decision makes some sense. An average Kansas voter—hoping to ferret out the source of an organization's funding—wouldn't see the name Kansans for Constitutional Freedom and suppose that foreign money helped fund KCF's efforts. So, Kansas permissibly decided that it wanted to address the back-door, less obvious foreign influence. And it left the more direct and overt influence for another day. *Williams-Yulee* allows a state to prioritize its most pressing concern without bumping its head up against underinclusiveness. 575 U.S. at 449. It's thus likely that HB 2106 will survive—even under strict scrutiny—though the statute permissibly might have further restricted foreign-funded speech.

With that work done, the court moves on to KCF's next argument of unconstitutionality under the First Amendment—liability for speech without a *mens rea* requirement.

### B. First Amendment Violation: Liability for Speech without *Mens Rea* Requirement

KCF next contends that § 25-4180(d) violates the First Amendment because it lacks a *mens rea* requirement but contemplates criminal prosecution and civil liability. Doc. 9 at 21–22. KCF premises its argument on *Counterman v. Colorado*, 600 U.S. 66 (2023). *See id.*

*Counterman* was a true threats case.  600 U.S. at 69.  It decided whether a criminal conviction for "true threats of violence" requires the government to prove the defendant had a subjective understanding of the threatening nature of his statements.  *Id.* (quotation cleaned up).  An individual had sent hundreds of Facebook messages to a local singer and musician, and some of those messages "envisaged harm befalling" the musician.  *Id.* at 70.  The question was whether the state had to show merely that a reasonable person would have viewed the Facebook messages as threatening.  Or, instead, did the state have to prove the defendant held a subjective intent to threaten to convict?  *Id.* at 71.

The Supreme Court held that, *one*, "the First Amendment requires proof of a defendant's subjective mindset" and, *two*, that the *mens rea* required is recklessness.  *Id.* at 72–73.  *Counterman* sustained the necessity of an intent requirement because of "the likelihood that the absence of such a *mens rea* requirement will chill protected, nonthreatening speech."  *Id.*  The Court explained that—without any *mens rea* requirement—a speaker may "swallow words that are in fact not true threats" out of fear "of mistaking whether the statement is a threat."  *Id.* at 78 (quotation cleaned up).  In short, the absence of a *mens rea* requirement may generate "self-censorship of speech" and "a cautious and restrictive exercise of First Amendment freedoms."  *Id.* at 75 (quotation cleaned up).

KCF asks the court to apply *Counterman* here to support two propositions.  *First*, KCF asks the court to conclude that the absence of a *mens rea* requirement in section (d) makes it unconstitutional.  Doc. 9 at 21–22.  *Second*, KCF contends that the speech restricted by HB 2106 is core First Amendment protected speech, and so the *mens rea* required here must exceed the recklessness required in *Counterman*.  *Id.*  KCF thus argues that "Kansas may not impose civil or criminal liability for spending related to constitutional ballot issue advocacy without requiring

proof of a mental state of 'purpose or knowledge.'"  *Id.* at 22 (quoting *Counterman*, 600 U.S. at 81).  And it asserts that the Legislature *intentionally* omitted the mental state requirement in section (d) as demonstrated by its intentionally including mental state elsewhere in HB 2106.  *Id.* This omission renders section (d) unconstitutional, KCF contends.  *Id.*  Defendants respond that *Counterman*'s holding "is limited to criminal prosecutions for true threats" and doesn't "require scienter in actions for civil liability[.]"  Doc. 27 at 20.  Defendants are right, and on both fronts.

The *Counterman* decision itself, and our Circuit's subsequent application of it, both suggest a limited holding.  Justice Kagan frames *Counterman*'s holding as one sounding in the true-threats context.  *See* 600 U.S. at 72 ("The first dispute here is about whether the First Amendment . . . demands that the State *in a true-threats case* prove that the defendant was aware in some way of the threatening nature of his communications." (emphasis added)); *id.* at 73 ("[T]he State must prove *in true-threats cases* that the defendant had some understanding of his statements' threatening character." (emphasis added)).  And *Counterman*—a criminal liability case—never holds that proof of mental state is required for civil liability.  *See generally id.* What's more, the Tenth Circuit has discussed *Counterman* just twice, and both cases specifically involved threats of violence.  *See Czajkowski v. Richardson*, No. 24-1064, 2024 WL 4579388, at *1–2 (10th Cir. Oct. 25, 2024) (discussing *Counterman* where pro se plaintiff made repeated death threats against a magistrate judge and defendant, so district court dismissed action with prejudice as a sanction); *Terry v. Drummond*, No. 24-6046, 2025 WL 707451, at *1, *9–10 (10th Cir. Mar. 3, 2025) (certifying question, in context of a criminal threats prosecution, to Oklahoma Court of Criminal Appeals and asking whether Oklahoma Riot Statute comports with *mens rea* required by *Counterman*).

KCF asks the court—in an expedited proceeding—to apply *Counterman* outside the true-threats context and even more, to extend its limitations to civil liability.  *See* Doc. 9 at 21–22; Doc. 32 at 11–12.  But KCF identifies no other court or Circuit that has applied *Counterman* as it suggests.  KCF deserves credit for an interesting and creative argument.  But the court declines to apply *Counterman* in such a novel fashion, particularly in the time-pressured and extraordinary context of preliminary relief.

Out of an abundance of caution, though, let's imagine that *Counterman* does apply to this case.  Presumably, it would demand a *mens rea* requirement for criminal liability in § 25-4180(d).[3]  Even then, defendants argue, the Kansas Criminal Code provides backstop intent to cure any *mens rea* deficiency in HB 2106.  Doc. 27 at 19 (first quoting Kan. Stat. Ann. § 21-5202(d)–(e) (requiring "intent," "knowledge[,]" or "recklessness" "to establish criminal responsibility" unless the definition of the crime "plainly dispenses with any mental element"); and then quoting *State v. Lewis*, 953 P.2d 1016, 1023 (Kan. 1998) ("[T]he intent requirement . . . applies regardless of whether the criminal offense is found in the criminal code or elsewhere in the statutes.")).  That sounds convincing at first blush.  KCF thinks otherwise.

Kansas's backstop intent won't suffice, KCF argues, because *Counterman* demands more than recklessness here.  Doc. 32 at 12.  And the backstop intent might provide just recklessness.  *See* § 21-5202(d)–(e) (requiring "intent," "knowledge[,]" or "recklessness").  KCF contends that

---

[3]    Defendants also assert that HB 2106's section (d) doesn't contemplate criminal liability.  Doc. 27 at 19.  That's not persuasive.  Section 25-4180(d)(2) provides that the "attorney general may prosecute" violators.  Section 25-4180(d)(3) discusses "any civil action brought by the commission or the attorney general."  Two pieces of these statutory provisions suggest criminal liability.  *First*, (d)(2)'s use of the word "prosecute" implies criminal liability.  And, *second*, (d)(2) permits *only* the attorney general to enforce the statute while (d)(3) permits *either* the commission or the attorney general to bring "any civil action."  This distinction in enforcer between (d)(2) and (d)(3)—and the fact that there's two separate sections to begin with—imply that (d)(2) deals with criminal liability.  So, KCF has the better of this argument.

the speech at issue in HB 2106—unlike the words at issue in *Counterman*—is "at the core of the First Amendment's protections." Doc. 32 at 12 (quotation cleaned up). And so, it "requires at least a showing of knowledge or purpose[.]" *Id.* In short, KCF asks the court to extrapolate— presumably from dicta in *Counterman*—that a higher intent requirement inheres in this setting. Apart from that higher intent requirement, KCF offers no reason why the Criminal Code's backstop intent wouldn't suffice. So, for KCF's argument to work, the court not only must apply *Counterman* but also must read *Counterman* to require more than recklessness to criminalize receipt of foreign money. Remember, the court's not even convinced that *Counterman* applies at all outside the true-threats context. And it's certainly not prepared to extrapolate this higher intent construction from dicta to enjoin—preliminarily—a state statute as unconstitutional. That's simply a bridge too far.

So, the court concludes KCF isn't likely to succeed on the merits of its no-*mens-rea* theory of unconstitutionality. It asks the court to apply Supreme Court precedent in a novel fashion, reliant, in meaningful part, on dicta. The court declines.

Now, the court turns to KCF's next theory of unconstitutionality: overbreadth and vagueness.

### C.  Unconstitutionally Overbroad and Vague

KCF also argues HB 2106 is facially unconstitutional because it's overbroad and vague. Doc. 9 at 22. Defendants' brief points to the "'rigorous'" standard applied to facial challenges, identifying its "'disfavored'" status "'[e]ven in the First Amendment context[.]'" Doc. 27 at 12 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723, 744 (2024)). Indeed, a facial challenge is the "most difficult challenge to mount successfully[.]" *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (internal quotation marks and citation omitted). That's so because claims of "facial

27

invalidity often rest on speculation about the law's coverage and its future enforcement.  And facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways."  *Moody*, 603 U.S. at 723 (internal quotation marks and citations omitted).  So, the Supreme Court has "made facial challenges hard to win." *Id.*

"The first step in the proper facial analysis is to assess the state laws' scope.  What activities, by what actors, do the laws prohibit or otherwise regulate?"  *Id.* at 724.  "The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest."  *Id.* at 725.  "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep."  *United States v. Hansen*, 599 U.S. 762, 770 (2023).  Start with overbreadth.

### 1.  Overbroad

"Overbroad laws 'may deter or chill constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'"  *Id.* at 769–70 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)).  "If the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid."  *Id.* at 770.

Here, KCF emphasizes the "vast amounts of protected speech" proscribed by HB 2106. Doc. 9 at 23.  It argues that the plain text of Kan. Stat. Ann. § 25-4180(a)(1)—part of HB 2106— "imposes a complete bar on speech of U.S. citizens who have *ever* knowingly accepted *any* 'contributions or expenditures' from a foreign national for *any purpose*[.]"  *Id.* (emphasis in

original) (quoting § 25-4180(a)).  And then KCF points to section (d) and argues that it

"criminalizes the acceptance of even $1."  *Id.* (quotation cleaned up).  Finally, KCF reiterates

that the accepted money can be "'for any purpose, not just those related to elections.'"  *Id.* at 24

(quoting Kansas Governor Laura Kelly from Exhibit E).  These arguments echo the

overinclusivity arguments under the narrow tailoring analysis, above.

Recall that the court concluded the statute's context—specifically the long extant section

(a)—narrows the scope of the contributions and expenditures at issue.  Section 25-4180(a)

explicitly ties those contributions and expenditures to "moneys or property for the purpose of

engaging" "in any activity promoting or opposing the adoption or repeal of any provision of the

constitution of the state of Kansas."  So, the court isn't convinced that HB 2106 "imposes a

complete bar on speech of U.S. citizens" premised on "*any* contributions or expenditures . . . for

*any purpose*."  Doc. 9 at 23 (emphasis in original) (quotation cleaned up).  Instead, fears of such

a broad sweep appear "fanciful," not "realistic[.]"  *Hansen*, 599 U.S. at 770.  And they implicate

the very "speculation about the law's coverage and its future enforcement" that the Supreme

Court has denounced in facial challenges.  *Moody*, 603 U.S. at 723 (quotation cleaned up).

Likewise unwarranted is KCF's concern that any knowing acceptance—"*ever*"—of such

contributions and expenditures bans speech.  As the court explains in more detail below, *see* § IV.

D, the parties seem to agree that the statute doesn't reach funds accepted by KCF—or anyone

else—before the bill's effective date of July 1, 2025.  Defendants explicitly assured the court that

HB 2106 functions strictly prospectively.  Doc. 36 at 24, 38 (Hr'g Tr. 24:18–23, 38:17–21).

These assurances apparently annulled KCF's concern about retroactive application.  If

defendants stray from their assurances to the court, the court can return to KCF's arguments—

considering them on a more informed basis.  But for now, fear that any knowing acceptance at

any point—including the past—infringes on KCF's free speech rights amounts to no better than guess work. That's not good enough.

In short, this case is a poster child for the dangers of facial invalidation premised on speculation. KCF envisions a breathtakingly broad law. And, to be fair, had KCF's interpretation of HB 2106 proved accurate, it would've had a very persuasive case. But the statute—read in context and coupled with defendants' strictly-prospective assurances—suggest a law whose "'plainly legitimate sweep'" outweighs any protected speech prohibitions. *Hansen*, 599 U.S. at 770 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). And so, the court rejects KCF's bid for a preliminary injunction premised on an unconstitutional overbreadth theory.

## 2. Vague

KCF also argues that HB 2106 is invalid, "facially and as applied, because multiple of its provisions are unconstitutionally vague in violation of due process." Doc. 9 at 24. "The void-for-vagueness doctrine requires that statutory commands provide fair notice to the public. This is especially true for election speech provisions that impinge on First Amendment rights." *Wyo. Gun Owners*, 83 F.4th at 1233. A court may conclude a statute is unconstitutionally vague "for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "[W]hen a law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Wyo. Gun Owners*, 83 F.4th at 1234 (internal quotation marks and citation omitted).

Here, KCF's vagueness arguments focus primarily on definitions for key terms used in the Kansas law. Doc. 9 at 24–28. KCF asks, for instance, how the definitions of "contribution," "expenditure," and "independent expenditure" in the overarching Kansas Campaign Finance Act—Kan. Stat. Ann. § 25-4143(f), (h), § 25-4148c(d)(2)—jive with the context of constitutional amendment activities. *Id.* at 24–25, 27–28. In a similar fashion, KCF also attacks how the term, "expenditure," functions in the constitutional amendment context—asking "How does one accept an 'expenditure'? And how does that act distinguish itself from accepting a 'contribution'?" *Id.* at 27. KCF also wonders what "indirectly" means, contending that the statute provides no guidance. *Id.* at 28. Finally, KCF argues that § 25-4180(a) is vague because it fails to draw a line between general issue advocacy and advocacy for or against a particular constitutional amendment. *Id.* at 26.

KCF aptly has identified the looser-than-ideal drafting in HB 2106. One wonders how KCF (or any other participant) can accept an expenditure. But, as already discussed, *see* § IV.A.1.b.i; IV.C.1, the explicit language in HB 2106's initial paragraph cures KCF's concerns about the definition for "contribution" and "expenditure." *See* Kan. Stat. Ann. § 25-4180(a). And, as defendants noted at the hearing, § 25-4180 "has been on the books since . . . at least 1987[.]" Doc. 36 at 27–28 (Hr'g Tr. 27:23–28:18). Individuals and organizations—including KCF itself—have complied with the previously extant provisions, despite its use of the now-allegedly-vague language. *See id.* at 19 (Hr'g Tr. 19:12–20). For example, KCF was able to "list[] their contributions and expenditures on the Commission's forms in the 2022 cycle three times" when they "oppose[d] a constitutional amendment in 2022[.]" *Id.* So, KCF "knew what a contribution and expenditure in the context of a constitutional amendment meant then[.]" *Id.* Defendants' emphasis on earlier compliance undermines KCF's vagueness challenge.

As defendants suggest, the offending language appears to have given "fair notice to the public" for the past 38 years. *Wyo. Gun Owners*, 83 F.4th at 1233. Defendants explained it this way at the hearing:

> Section 4180 has been in effect . . . since 1987. In fact, until now it's been a pretty sleepy statute. So 4180 has always let folks know who are engaged in the activity . . . of promoting or opposing [an] amendment or repeal of a section of the Kansas constitution [about] reporting requirements for contributions and expenditures.

Doc. 36 at 22 (Hr'g Tr. 22:16–23). What's more, KCF never identifies any lack-of-notice incidents or "arbitrary [or] discriminatory enforcement[,]" *Hill*, 530 U.S. at 732, over the past four decades that would undercut defendants' "sleepy statute" contentions. Doc. 36 at 22 (Hr'g Tr. 22:18–19). Defendants argued that HB 2106 simply "piggybacks" on the already extant statute, adding "requirements aimed at barring foreign money." *Id.* (Hr'g Tr. 22:24–25). In short, HB 2106 splices itself into the long history of existent—and uncontested—reporting requirements, followed without issue for years. Even under the requisite "more stringent vagueness test," defendants' argument persuades. *Wyo. Gun Owners*, 83 F.4th at 1234. If HB 2106 is as vague and problematic as KCF contends, how have persons and entities followed the extant portion—which includes much of the same allegedly vague language—without difficulty and for so long?

One final challenge to HB 2106 remains: KCF fears defendants will implement it retroactively. The court addresses this final concern, below.

### D.  Fourteenth Amendment Violation:  Retroactively Punishing Then-Lawful Content

"[S]tatutory retroactivity has long been disfavored[.]" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268 (1994). "The Due Process Clause . . . protects the interests in fair notice and repose that may be compromised by retroactive legislation[.]" *Id.* at 266. And "a justification

sufficient to validate a statute's prospective application under the [Due Process] Clause 'may not suffice' to warrant its retroactive application." *Id.* (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17 (1976)). Adding more cause for concern, legislatures may "use retroactive legislation as a means of retribution against unpopular groups or individuals." *Id.* KCF seems to believe that's what the Legislature has done here. *See* Doc. 1 at 18 (Compl. ¶ 72); Doc. 9 at 8 ("HB 2106 is a direct response to KCF's 2022 advocacy efforts.").

To assess retroactivity, "the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 269–70. Under Kansas law, a new statute is presumptively prospective in nature, unless the legislature clearly overcomes that presumption. *In re Hunt*, 82 P.3d 861, 870 (Kan. Ct. App. 2004) ("In determining whether the provisions of any statute apply prospectively or retroactively, the general rule is that a statute operates only prospectively unless there is clear language indicating the legislature intended otherwise." (citing *In re Tax Appeal of Alsop Sand Co.*, 962 P.2d 435 (Kan. 1998)).

In its briefing, KCF argued that HB 2106 is retroactive. Doc. 9 at 29. It contended that HB 2106 "bars persons from engaging in constitutional advocacy for up to four years" based on § 25-4180(a)(2). *Id.* KCF also argues that the plain terms of § 25-4180(a)(1)—which has no time limitation—"*permanently* bar any person from engaging in any activity promoting or opposing a constitutional amendment unless that person can certify that they have *never* knowingly accepted contributions or expenditures from a foreign national[.]" *Id.* (emphasis in original). Defendants' response brief argues that HB 2106 is purely prospective and that it also "enjoys a strong presumption against retroactive application in any event." Doc. 27 at 21. And so, defendants assert, a "person like Plaintiff who solicited moneys from foreign nationals to

33

advocate for past constitutional amendments is not prohibited from advocating for future amendments because of those past receipts. Plaintiff would only violate the Act to the extent it accepts foreign moneys for future constitutional advocacy." *Id.* at 22. Despite defendants' prospective-only contentions, the court shared KCF's retroactive concerns going into the preliminary injunction hearing. How could a four-year look-back period square with a prospective-only statute?

Defendants clarified their position at the hearing. They reframed the four-year look-back period, explaining that it strictly serves to define whether a donor's funds qualify as foreign *after* July 1, 2025. *See* Doc. 36 at 21 (Hr'g Tr. 21:8–10). That is, by asking if a donor has accepted foreign funds over the last four years, an organization can "know if the money [it's] about to take is foreign money" limited by HB 2106 going forward. *Id.* at 21–22 (Hr'g Tr. 21:21–22:2). And defendants assured the court at the hearing that HB 2106 wouldn't apply retroactively:

> [T]here's been no positive obligation on you up until this date. I'm saying that the effective date of the law is July 1st[, 2025]. There's a positive obligation on you as of July 1st to ask the question: Am I taking foreign money as defined here? Before that there was not. . . . [T]he retroactivity issue is . . . not about punishing plaintiff for what they've done in their past when it was perfectly legal. It's about helping them know what they can and cannot take after July 1st.

Doc. 36 at 24, 38 (Hr'g Tr. 24:18–23; 38:17–21). It seems defendants' assurances satisfied KCF. Later in the hearing, KCF essentially abandoned its retroactivity argument—it acknowledged that the parties agree on the issue and redoubled its efforts on the prospective front:

> I think from the retroactivity point there's been a lot of discussion, but the parties agree it can't be applied retroactively. So I don't really know why we're disputing that so much. Like, our purpose is to show that it can't be applied retroactively, and they seem to agree. So I think that's good. The real issue is whether it can be applied prospectively[.]

*Id.* at 39 (Hr'g Tr. 39:13–20).

The parties thus appear to agree that applying HB 2106 retroactively in any sense would violate due process. And defendants have represented to the court that they will apply HB 2106 strictly prospectively, starting July 1, 2025. Relying on defendants' representations and KCF's abandonment, the court stays its hand. It thus concludes enjoining retroactive applications of HB 2106 is unnecessary at this time. But defendants should know—and it seems they do—that any retroactive effect could present substantial due process problems. If future circumstances displace defendants' assurances, KCF can renew its due process challenge. And the court would return promptly to this issue.

Before the court recites its conclusions, it addresses one final matter—defendants' pending Motion to Dismiss (Doc. 28) and their argument for prudential unripeness.

## V.    Prudential Ripeness

Defendants have moved to dismiss—or hold this case in abeyance—on prudential ripeness grounds. Doc. 28 at 2. Defendants note that the KGEC hasn't promulgated rules and regulations interpreting HB 2106 yet. *Id.* And so, defendants argue, federal intervention now would be premature, usurping KGEC's delegated authority and raising substantial federalism concerns. *Id.*

Both parties engaged in some level of argument about prudential ripeness in their preliminary injunction briefing. *See* Doc. 27 at 12–16; Doc. 32 at 6–9. But both parties also have filed separate briefs on the issue. Doc. 28; Doc. 33. And at the time of this Order, this briefing isn't complete yet—defendants still may file a reply. The court has expedited this Order, at KCF's request, to decide its Preliminary Injunction Motion (Doc. 9) before HB 2106's July 1, 2025, effective date. And so, the court won't delay this Order until the prudential ripeness briefing concludes. Nor will it rule the Motion to Dismiss (Doc. 28) prematurely.

For now, it suffices to say that the court wasn't persuaded to halt its preliminary injunction ruling on prudential ripeness grounds. Without engaging in a full analysis yet, the court explains its decision briefly. *First*, a "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Utah Republican Party v. Cox*, 892 F.3d 1066, 1092 (10th Cir. 2018) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). The only allegedly contingent future event defendants could identify was KGEC's development of forms and instructions implementing HB 2106. *See* Doc. 36 at 19–20 (Hr'g Tr. 19:3–20:2). But defendants conceded that there's not anything the form could say that would nullify, in effect, any of HB 2106's requirements. *See id.* at 20 (Hr'g Tr. 20:3–14). So, the court doesn't see how forms and instructions constitute a contingent future event in line with Tenth Circuit case law.

*Second*, facial challenges "are generally considered to be strictly legal questions that do not involve the application of the law in a specific factual setting." *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (quotation cleaned up). "And even when a case presents an as applied challenge, it is fit for judicial review if 'the facts of the case are relatively uncontested.'" *Koontz v. Watson*, 283 F. Supp. 3d 1007, 1017 (D. Kan. 2018) (quoting *Kan. Jud. Rev. v. Stout*, 519 F.3d 1107, 1118 (10th Cir. 2008)). KCF brings constitutional challenges, both facial and as applied. And defendants haven't identified any contested facts in this case. The court thus considers the case fit for judicial review. This is admittedly a truncated analysis, focusing only on the first of two prudential ripeness prongs. But it suffices to explain the court's decision—at the preliminary injunction stage—to proceed without any prudential ripeness concerns. The court will complete a more fulsome analysis after it has opportunity to consider the parties' full briefing on the issue.

**VI.    Conclusion**

The court concludes KCF is unlikely to succeed on the merits of its claim.  Subjecting

HB 2106 to strict scrutiny, the court decides that Kansas likely has a compelling interest in

limiting foreign influence in its constitutional amendment ballot issue elections.  And defendants

have established sufficiently at this preliminary stage that HB 2106 is narrowly tailored.  The

court is unpersuaded that KCF's *mens rea* argument—premised as it was on a true-threats case—

applies as argued.  And KCF's speculative interpretation of HB 2106—along with the long extant

portions of Kan. Stat. Ann. § 25-4180—appear to undermine KCF's overbreadth and vagueness

arguments.  Finally, the parties seem to agree that HB 2106 operates strictly prospectively,

allowing the court to stay its hand.  KCF thus has failed to establish a likelihood of success on

the merits on any of its constitutional theories.  And so, the court denies KCF's Motion for a

Preliminary Injunction (Doc. 9).

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff Kansans for

Constitutional Freedom's Motion for Preliminary Injunction (Doc. 9) is denied.

**IT IS SO ORDERED.**

**Dated this 30th day of June, 2025, at Kansas City, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**